PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

JAMES H. SPRIGGS,
         *Plaintiff-Appellant,*

v.

DIAMOND AUTO GLASS; RICHARD A.
RUTTA; ERNEST STICKELL,
         *Defendants-Appellees.*

No. 99-2393

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Frederic N. Smalkin, District Judge.
(CA-97-1449-S, CA-98-1370-S)

Argued: September 28, 2000

Decided: February 22, 2001

Before LUTTIG and KING, Circuit Judges, and
HAMILTON, Senior Circuit Judge.

Vacated and remanded by published opinion. Judge King wrote the
opinion, in which Judge Luttig and Senior Judge Hamilton joined.

## COUNSEL

**ARGUED:** Vickie Inge Fang, HERBERT DUBIN, Greenbelt, Maryland, for Appellant. Angus Robert Everton, MORGAN, SHELSBY, CARLO, DOWNS & EVERTON, Hunt Valley, Maryland, for Appellees. **ON BRIEF:** Alex T. Sliheet, HERBERT DUBIN, Greenbelt, Maryland, for Appellant. Jonathan D. Fishbane, ROETZEL & ANDRESS, Naples, Florida, for Appellees.

**OPINION**

KING, Circuit Judge:

James H. Spriggs appeals the district court's award of summary judgment to his former employer, Diamond Auto Glass ("Diamond"), in Spriggs's action alleging racial discrimination in violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17. As we explain below, genuine issues of material fact remain to be resolved in this dispute; we therefore vacate the lower court's judgment and remand the matter for trial.

I.

This case is before us for the second time. In *Spriggs v. Diamond Auto Glass*, 165 F.3d 1015 (4th Cir. 1999) (*Spriggs I*), we briefly outlined the facts as alleged in the complaint. Therein we noted that Spriggs, an African-American, had been employed by Diamond as a customer service representative in its Forestville, Maryland store from July 1993 until August 1995,[1] and again from September 1996 until February 1997. On both occasions, Spriggs left Diamond's employ dissatisfied with the company's response to certain actions taken toward him by his white supervisor, Ernest Stickell. The details of these events having now been more fully developed through the discovery process, we relate them here in the light most favorable to Spriggs. *See Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 276-77 (4th Cir.) (citations omitted), *cert. denied*, 121 S. Ct. 181 (2000).

A.

1.

At his deposition, Spriggs testified that he left Diamond the first time because of Stickell's incessant racial slurs, insults, and epithets. Indeed, Stickell rarely hesitated to vilify anyone of African descent, including Diamond employees (whom he proclaimed "niggers" or

---

[1]From the materials produced during discovery, it now appears that Spriggs initially separated from Diamond on September 7, 1995. *See infra* note 10.

"monkeys") and customers of the business. Not even Stickell's wife, an African-American, was off-limits, as Stickell repeatedly referred to her as a "black bitch" in Spriggs's presence. Stickell often became enraged during telephone conversations with his wife, causing him to "fly into a barrage of racial obscenities towards her and slam the phone down. She would call back. Once again, she was a no-good nasty bitch. It was continuous daily." J.A. 195.

2.

Spriggs was eventually persuaded to return to the Forestville store on management's assurance that Stickell would be kept in check. It quickly became clear, however, that Diamond would not deliver on its promise, as Stickell's behavior did not improve, but actually worsened. In addition to maintaining his routine of talking about his wife in racially derogatory terms, Stickell habitually called Spriggs a "monkey," "dumb monkey," and "nigger." In one particularly egregious episode, Stickell placed a picture of a monkey between the pages of a parts manual (known as a "NAG book") that Spriggs regularly used. Stickell had captioned the picture with X's and O's, along with the notation "so you'll never forget who you are." J.A. 209.

On Thursday, February 6, 1997, Spriggs walked out of the Forestville store "to alleviate the onslaught." J.A. 211. Spriggs attempted to return to work the following Monday, February 10, but Stickell denied him access to the premises. A dialogue ensued involving Spriggs and various representatives of Diamond, including its president, Richard Rutta. As a result of these discussions, Spriggs was invited to resume working on March 10, 1997. When Spriggs arrived on the appointed date, however, Stickell presented him with a formal list of job duties, which Spriggs believed to be unduly onerous and racially motivated. Rather than accept the new conditions, Spriggs resigned his employment.

B.

Spriggs filed suit in the District of Maryland on April 30, 1997, against Diamond, Rutta, and Stickell. The complaint alleged that the defendants had violated 42 U.S.C. § 1981 by subjecting Spriggs to a racially hostile work environment during both of his terms of employ-

ment. When Spriggs protested his treatment, Stickell retaliated by imposing unreasonable working conditions. This atmosphere of hostility and retaliation reached its crescendo with the events of March 10, 1997, resulting in his constructive discharge.

The defendants moved to dismiss the complaint under Fed. R. Civ. P. 12(b)(6) on the ground that Spriggs had been an at-will employee of Diamond and, as such, could not avail himself of § 1981, which guarantees to persons the right "to make and enforce contracts." 42 U.S.C. § 1981(a). The district court agreed with the defendants' position, and it ordered the complaint dismissed with prejudice on October 15, 1997. Following the lower court's denial on October 27, 1997, of his motion for reconsideration, Spriggs filed a timely notice of appeal.

Subsequently, on November 19, 1997, Spriggs submitted a verified charge to the Equal Employment Opportunity Commission ("EEOC"), averring that he had been discriminated against on account of his race, in contravention of Title VII. The EEOC referred the charge to the Maryland Commission on Human Relations, which investigated the matter. On January 30, 1998, after the termination of the state administrative proceedings, the EEOC issued Spriggs a right-to-sue letter. *See* 29 C.F.R. § 1601.28(b). Thereafter, on April 29, 1998, Spriggs filed a second complaint in the district court, essentially mimicking the factual allegations of the § 1981 complaint but asserting entitlement to relief under Title VII.[2]

On January 28, 1999, during the pendency of the Title VII proceedings, we issued our decision in *Spriggs I*. Therein, we reversed the district court's dismissal of the § 1981 complaint, holding that because "an at-will employment relationship is contractual . . . such

---

[2] The second complaint contained an additional claim that, in September 1997, Stickell falsely gave Spriggs a negative job reference in retaliation for Spriggs having asserted his Title VII rights during his tenure with Diamond. The district court dismissed this claim because it was not mentioned in the verified charge presented to the EEOC, and therefore not properly exhausted. *See Taylor v. Virginia Union Univ.*, 193 F.3d 219, 239 (4th Cir. 1999) (en banc) (citation omitted). The district court's ruling in this regard has not been appealed.

relationships may therefore serve as predicate contracts for § 1981 claims." *Spriggs I*, 165 F.3d at 1018-19. Our reversal necessitated that the case be remanded for further proceedings.

By its order of March 12, 1999, the district court consolidated the Title VII action with the § 1981 case on remand. A brief period of discovery ensued, at the close of which the defendants moved for summary judgment. On September 10, 1999, the district court entered a final order awarding summary judgment to each defendant on all claims. Spriggs appeals the judgment below only as to Diamond, having abandoned his claims against the individual defendants.[3]

## II.

We review the district court's grant of summary judgment de novo. *Kubicko v. Ogden Logistics Servs.*, 181 F.3d 544, 551 (4th Cir. 1999). Summary judgment is appropriate only in those cases where the pleadings, affidavits, and responses to discovery "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A material fact is one "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A disputed fact presents a genuine issue "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.*

## III.

To survive summary judgment for Diamond on his claims of a racially hostile work environment, Spriggs must demonstrate that a reasonable jury could find Stickell's harassment (1) unwelcome; (2) based on race; and (3) sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere. *See Causey v. Balog*, 162 F.3d 795, 801 (4th Cir. 1998) (citation omitted). Further, even if the record supports the conclusion that a triable issue exists with regard to each of these three elements, Spriggs may not

---

[3]*See* Brief of Appellant at 30 (requesting remand for trial on the merits "only against Defendant Diamond Auto Glass and not against Defendant Rutta and Defendant Stickell").

prevail absent sufficient evidence of a fourth element: that "there is some basis for imposing liability" on Diamond. *Id.* The elements are the same under either § 1981 or Title VII. *Id.* at 804 (citing *Gairola v. Virginia Dep't of Gen. Servs.*, 753 F.2d 1281, 1285 (4th Cir. 1985)).[4]

There is no genuine dispute that Stickell's actions and comments were both unwelcome and based on race. We will therefore focus on the third and fourth elements of the hostile work environment claims: whether the harassment was sufficiently severe or pervasive, and whether liability for Stickell's conduct should be imputed to Diamond.

### A.

The degree of hostility or abuse to which Spriggs was exposed can only be determined by examining the totality of the circumstances. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). Relevant considerations "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* To be actionable, the conduct must create an objectively hostile or abusive work environment, and the victim must also perceive the environment to be abusive. *Lissau v. Southern Food Serv., Inc.*, 159 F.3d 177, 183 (4th Cir. 1998) (citing *Harris*).

### 1.

During his initial term with Diamond, Spriggs was exposed on a "continuous daily" basis to Stickell's racist comments concerning African-Americans in general, and Stickell's wife most particularly.

---

[4]Spriggs's hostile work environment claims under the two provisions are not coextensive, however. Although Spriggs seeks to impose liability on Diamond under § 1981 with regard to both terms of employment, his Title VII claim is confined to the events enumerated in the EEOC charge, all of which took place during his second term. *See Edelman v. Lynchburg College*, 228 F.3d 503, 506 (4th Cir. 2000) (administrative exhaustion prerequisite to assertion of Title VII claim in federal court) (citing *Taylor*, 193 F.3d at 239, *supra* note 2).

Although Diamond contends that conduct targeted at persons other than Spriggs cannot be considered, its position finds no support in the law. We are, after all, concerned with the "environment" of workplace hostility, and whatever the contours of one's environment, they surely may exceed the individual dynamic between the complainant and his supervisor. *See Walker v. Ford Motor Co.*, 684 F.2d 1355, 1359 n.2 (11th Cir. 1982) ("The fact that many of the epithets were not directed at [the plaintiff] is not determinative. The offensive language often was used in [his] presence."); *see also Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1415 (10th Cir. 1987) ("[O]ne of the critical inquiries in a hostile environment claim must be the environment. Evidence of a general work atmosphere therefore — as well as evidence of specific hostility directed toward the plaintiff — is an important factor in evaluating the claim.").[5]

Far more than a "mere offensive utterance," the word "nigger" is pure anathema to African-Americans. "Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordi-

---

[5]*Accord Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022, 1033-34 (9th Cir. 1998); *Waltman v. International Paper Co.*, 875 F.2d 468, 477 (5th Cir. 1989); *Vinson v. Taylor*, 753 F.2d 141, 146 (D.C. Cir. 1985) (citation omitted); *cf. Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 674 (7th Cir. 1993) (court may consider "the lexicon of obscenity that pervaded the environment of the workplace both before and after the plaintiff's introduction into its environs").

Our decision in *White v. Federal Express Corp.*, 939 F.2d 157 (4th Cir. 1991), is not to the contrary. In *White*, we expressed our disagreement with the district court that the plaintiff had made a prima facie showing of a hostile work environment, noting, inter alia, the lower court's observation that "[m]ost of the racist incidents detailed . . . were not directed against plaintiff . . . ." *Id.* at 160. The basis for our disagreement however, was not the specific targeting of the offending conduct, but the utter lack of any evidence that the plaintiff himself had been offended. *Id.* at 161. Moreover, none of our discussion in this regard was essential to deciding the case, inasmuch as we concluded that even if a hostile work environment had existed, liability could not be imputed to the employer. *Id.*

nates." *Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993) (citation and internal quotation marks omitted).[6]

Stickell's constant use of the word "monkey" to describe African-Americans was similarly odious. To suggest that a human being's physical appearance is essentially a caricature of a jungle beast goes far beyond the merely unflattering; it is degrading and humiliating in the extreme. *See Walker v. Thompson*, 214 F.3d 615, 626 (5th Cir. 2000) (triable issue raised with regard to hostile work environment where, inter alia, supervisors verbally assailed African-American employees with physically humiliating comparisons to "monkeys" and "slaves").

Stickell's frequent and highly repugnant insults were sufficiently severe or pervasive (or both) to cause a person of ordinary sensibilities to perceive that the work atmosphere at the Forestville store was racially hostile. And there is plenty of evidence that Spriggs himself regarded Stickell's conduct as abusive. According to his affidavit submitted in opposition to Diamond's motion for summary judgment, Spriggs complained several times to his supervisors about Stickell's racial slurs.[7] Spriggs stated that Stickell's behavior "affected my emo-

---

[6]*Cf. Bailey v. Binyon*, 583 F. Supp. 923, 927 (N.D. Ill. 1984) ("The use of the word 'nigger' automatically separates the person addressed from every non-black person; this is discrimination per se.").

[7]The district court disregarded the affidavit evidence of Spriggs's complaints on the ground that his averments were inconsistent with his deposition testimony. Memorandum Opinion of September 9, 1999, at 11 n.7 [hereinafter "Mem. Op."] (citing *Rohrbough v. Wyeth Laboratories, Inc.*, 916 F.2d 970 (4th Cir. 1990)). In *Rohrbough*, we reaffirmed the longstanding principle that a party against whom summary judgment is sought cannot create a jury issue by identifying discrepancies in his own account of the facts. *See id.* at 975 (citing *Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir. 1984)).

Of course, for the rule in *Rohrbough* to apply, there must be a bona fide inconsistency. The court below characterized the deposition testimony as evidencing Spriggs's failure to recall "any communication" to Diamond complaining of Stickell's conduct, which, if accurate, would certainly contradict statements in Spriggs's affidavit that he orally complained to his immediate supervisor and later telephoned the District

tional health and self esteem and interfered with my ability to concentrate on my work and effectively interact with my customers." J.A. 113. We are therefore satisfied that a reasonable jury examining the totality of the circumstances could find, in accordance with *Lissau*, that a hostile work environment confronted Spriggs during his first term of employment with Diamond.

2.

The evidence militates even more strongly in favor of Spriggs with regard to his second term of employment. It was then that Stickell's incessant racial invective began to target Spriggs individually, and it was also during this period that Stickell placed the picture of the monkey in the NAG book for Spriggs to find. Spriggs continued to subjectively perceive his work environment as racially hostile, as evidenced by his complaints to the District Manager that he was "outraged" by

---

Manager. In actuality, however, the relevant portion of the deposition testimony is not as clear-cut as the district court apparently believed:

Q. At any point in time, did you hand any letter or communication to Diamond Auto after you left in September or even before September of 1995 complaining of any kind of racial abuse?

A. After '95 you are asking?

Q. I'm asking at the time you left the first time.

A. Not that I can recall.

J.A. 184.

We note at the outset that the time frame referenced in the deposition is unclear; the initial question was apparently meant to cover the entirety of Spriggs's tenure with Diamond, but the follow-up seems to limit the inquiry to the specific date of separation. In contrast, the affidavit refers solely to complaints that Spriggs made while he was still in Diamond's employ. More importantly, the deposition testimony addresses only those complaints conveyed by "letters" or "communications" of a sort that could physically be "handed" to a Diamond representative. Oral complaints, whether made in person or telephonically, were patently outside the scope of the questioning. We discern no inconsistency between Spriggs's affidavit and his deposition testimony; hence, the rule in *Rohrbough* has no application here.

the picture incident and that Stickell's conduct otherwise offended him. J.A. 117. In light of the record before us, a reasonable jury could find that Spriggs was subjected to a hostile work environment during his second term of employment with Diamond.

B.

Employers are not automatically liable for acts of harassment levied by supervisors against subordinates. *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 72 (1986). Rather, there must be some basis in law for imputing the acts of the supervisor to the employer. Where an employee suffers a tangible employment action at the hands of his supervisor (or successively higher authority) as the result of prohibited discrimination, then the employer may be held liable on the premise that the supervisor acted within the scope of his agency. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 762-63 (1998).[8] Tangible employment actions, the Supreme Court has said, "fall within the special province of the supervisor. . . . [They] are the means by which the supervisor brings the official power of the enterprise to bear on subordinates." *Id.* at 762. Hence, "a tangible employment action taken by the supervisor becomes for Title VII purposes the act of the employer." *Id.*

A hostile work environment claim, however, typically encompasses conduct outside the realm of tangible employment actions. *See Ellerth*, 524 U.S. at 751, 753-54 (distinguishing so-called "quid pro quo" claims involving realized threats of adverse employment actions from hostile work environment claims arising from "bothersome attentions or [offensive] remarks . . . preceding the employment decision"). An employer does not, of course, prevail under Title VII by the fortuity of no tangible employment action having been taken against the complainant, but the standard for imposing liability is made more stringent by the availability of an affirmative defense. The employer may escape liability if it can demonstrate, by a preponder-

[8]A "tangible employment action" occurs whenever "a significant change in employment status" is effected, "such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth*, 524 U.S. at 761.

ance of the evidence, that (1) it "exercised reasonable care to prevent and correct promptly any harassing behavior"; and (2) the plaintiff "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Id.* at 765; *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998).[9]

1.

Spriggs presents no argument that he was the subject of a tangible employment action during his first term at the Forestville store.[10] In

_____

[9]Although *Ellerth* and *Faragher* each specifically dealt with claims of sexual harassment, the developing consensus is that the holdings therein apply with equal force to other types of harassment claims under Title VII. *See Allen v. Michigan Dep't of Corr.*, 165 F.3d 405, 411 (6th Cir. 1999) (*Ellerth* and *Faragher* affirmative defense permitted in response to claim of racial harassment); *Deffenbaugh-Williams v. Wal-Mart Stores, Inc.*, 156 F.3d 581, 593 (5th Cir. 1998) (same), *opinion vacated sub nom. Williams v. Wal-Mart Stores, Inc.*, 169 F.3d 215 (5th Cir. 1999), *reinstated in pertinent part*, *Williams v. Wal-Mart Stores, Inc.*, 182 F.3d 333 (5th Cir. 1999); *Wright-Simmons v. City of Oklahoma City*, 155 F.3d 1264, 1270 (10th Cir. 1998) (same). This notwithstanding the dissenters' admonition in *Ellerth* that the approach endorsed by the Court would cause "employer liability under Title VII [to be] judged by different standards depending upon whether a sexually or racially hostile work environment is alleged." *Ellerth*, 524 U.S. at 767 (Thomas, J., dissenting). We nonetheless agree with our sister circuits that *Ellerth* and *Faragher* apply to the full range of harassment claims covered by Title VII. In so concluding, we take solace in Justice Souter's observation that "[a]lthough racial and sexual harassment will often take different forms, and standards may not be entirely interchangeable, we think there is good sense in seeking generally to harmonize the standards of what amounts to actionable harassment." *Faragher*, 524 U.S. at 787 n.1.

[10]Diamond's personnel records indicate that Spriggs quit shortly after arriving late for work on September 7, 1995, upon being notified by Stickell that a meeting addressing employee tardiness would be held the ensuing Monday. A report from the state Office of Unemployment Insurance confirms that a confrontation occurred between Spriggs and Stickell regarding the former's tardiness, but it also notes Diamond's official position that Spriggs was laid off for lack of work. From these and other materials in the record, an inference arises that Diamond may have

the absence of a tangible employment action, Diamond is permitted to demonstrate its entitlement to the affirmative defense. Accordingly, we must evaluate the care that Diamond exercised to prevent and correct Stickell's abuse, in conjunction with any opportunity that Spriggs may have had to avail himself of Diamond's efforts.

At the outset of his employment with Diamond, Spriggs was given an employee handbook reciting the company's policies with respect to various matters such as leave, benefits, substance abuse, and general conduct. Under the rubric of "Equal Opportunity," the handbook provided, in pertinent part:

> Our goal is to establish and maintain a work environment free from discrimination, coercion, and harassment.
>
> . . .
>
> Any discrimination in the workplace based upon membership in any protected classification is illegal and against Company policy. If you are aware of any violation of this policy, you should report it to any Company officer. Any infraction of this policy is a serious violation and will result in disciplinary action, up to and including termination.

J.A. 75. The "institution and enforcement" of such a policy, in conjunction with an "adequate complaint procedure," aid the employer in establishing that it has exercised reasonable care to prevent discrimination. *See Brown v. Perry*, 184 F.3d 388, 395 (4th Cir. 1999). However, the "mere promulgation" of an anti-harassment policy, no matter how well-conceived, will not suffice to show the requisite level of care where the employer has administered the policy in bad faith or has rendered it ineffectual by acting unreasonably. *See id.* at 396.

---

acquiesced to Spriggs's eligibility for unemployment benefits after Spriggs contacted the company's human resources department to complain of Stickell's abuse. Other than the happenstance of Stickell's involvement in the climactic incident, however, there is little evidence that Spriggs's initial departure was the immediate consequence of discrete, racially motivated conduct.

Spriggs maintains that he complained to Bob Woods, the Office Manager, concerning "Mr. Stickell's use of profanity, verbal screaming, and racial slurs at the Forestville store." J.A. 114. Woods then met with Spriggs and Stickell, instructing the latter "not to use racist language." *Id.* Notwithstanding the provision of the employee handbook relating to the reporting of such incidents, Woods made it clear that the matter was to be resolved within the shop, warning Spriggs that "[y]ou don't call no fucking Jay [Shaffer, the District Manager and Woods's supervisor]." *Id.* Undaunted, Spriggs did contact Shaffer, but to no avail. Shaffer downplayed the complaints, opining that Stickell "did not mean anything by his language." *Id.* As a result of Shaffer's inaction, Stickell's insults continued unabated until Spriggs departed.

Under these circumstances, a jury could rationally conclude that, although Diamond's institution of an anti-harassment policy represented a reasonable step toward preventing the type of abuse suffered by Spriggs, the company unreasonably failed to correct Stickell's offending behavior by neglecting to enforce the policy. Diamond's entitlement to the affirmative defense is therefore a triable issue.[11]

2.

With regard to the second term of employment, the question of imputation is somewhat more complex. At the outset, Spriggs contends that his lockout by Stickell on February 10, 1997, *see supra* Part I.A.2, constituted a tangible employment action precluding Diamond's assertion of the affirmative defense outlined in *Ellerth* and *Faragher*. Spriggs points out that he was not paid following the lockout, thus qualifying Stickell's decision as one "causing a significant change in benefits." *See Ellerth*, 524 U.S. at 761, *supra* note 8. In response, Diamond maintains that Spriggs's employment terminated

---

[11]Because the first prong of the affirmative defense has not been established as a matter of law, we need not extensively consider whether Spriggs unreasonably failed to take advantage of any opportunities that Diamond may have offered to correct Stickell's harassment. The evidence is in conflict on this point, and it suffices to say that, if Spriggs's version of events is believed, he was never afforded the chance to participate in resolving the situation.

prior to the lockout, i.e., when Spriggs walked off the job four days earlier.

The record before us is inadequate to determine with any certainty whether Spriggs intended to resign by walking out, or whether Stickell instead decided to suspend him as a result of the incident.[12] Assuming, for the sake of argument, that the latter occurred, we are nonetheless left to speculate as to the factors motivating Stickell's decision. *See Lissau*, 159 F.3d at 182 ("Tangible employment actions, if not taken for discriminatory reasons, do not vitiate the affirmative defense.").

In any event, the issue of responsibility for Spriggs's furlough, though genuinely in dispute, is not one of material fact on which the merits of this appeal may be judged. We so conclude because even if no tangible employment action was taken against Spriggs, Diamond plainly failed to sustain its burden on summary judgment to show that it is entitled to the affirmative defense as a matter of law. A review of the evidence pertinent to this latter point is therefore in order.

a.

As a consequence of Spriggs's initial departure in September 1995 and the circumstances leading thereto, Diamond was aware of the tension surrounding his relationship with Stickell. Indeed, Spriggs was persuaded to resume working for Diamond only after being assured that Shaffer would do his best to control Stickell. In December 1996, during one of Shaffer's visits to the Forestville store, Spriggs related the details of the NAG book incident, at which point it was obvious that Stickell had not conformed his behavior to the required standard. Spriggs had been outraged and offended by Stickell's conduct, and he communicated these feelings to Shaffer. Rather than attempting to resolve the matter, however, Shaffer told Spriggs that Stickell's actions were nothing more than "typical Ernie." J.A. 117.

---

[12]The distinction may be illusory if it is ultimately determined that Spriggs quit, but Stickell discriminatorily refused to hire him back. Tangible employment actions include those relating to hiring decisions. *See Ellerth*, 524 U.S. at 761, *supra* note 8.

On Friday, February 7, 1997, the day after Spriggs walked out, he participated in a three-way telephone conversation with Shaffer and Stickell. During this discussion, Spriggs complained that he had been "constantly subjected to racial slurs, insults, and abuse over the last six months at my job by Mr. Stickell. These racial comments have included the use of such words as Nigger, Black Bitch, and being called a monkey on an almost daily basis . . . ." J.A. 127. In response, Shaffer continued to defend the supervisor's behavior, insisting that "Mr. Stickell does not mean the words to be taken in a negative way." *Id.*

The above conversation was documented in a letter from Spriggs to Shaffer dated February 10, 1997.[13] Two days later, Shaffer died

---

[13]The district court erroneously characterized the February 10 letter as "unsworn and hearsay not properly considered on a motion for summary judgment." Mem. Op. at 7. To the contrary, Spriggs submitted the letter with a properly executed affidavit affirming that the letter's contents were based on his personal knowledge and accurately reflected the February 7 conversation.

As incorporated by reference into the affidavit, the letter meets the foundational requirements of Fed. R. Civ. P. 56(e) ("[A]ffidavits shall be made on personal knowledge [and] shall set forth such facts as would be admissible in evidence . . . . Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith."). In effect, the affidavit reasserts and verifies the statements in the letter, each of which Spriggs could testify to at trial. Shaffer's statement of Stickell's intent in making the offending remarks is likewise admissible because it would be offered not to prove the truth of the matter asserted (that Stickell intended no offense), but to prove Shaffer's indifference. *See* Fed. R. Evid. 801(c).

The lower court also perceived an inconsistency between the letter and Spriggs's deposition testimony. During his deposition, Spriggs was asked, "It's also true, is it not, that at no time did you talk about any racial issues in that [February 7] phone call." Spriggs answered, "I don't recall that." J.A. 213. Counsel did not pursue the matter, so the meaning of Spriggs's response was not further defined. Spriggs could have meant to say either "I don't recall talking about any racial issues," or "my recollection is not in agreement with your characterization," or even "I don't remember the conversation at all." In light of this ambiguity, there can be no bona fide inconsistency; therefore, the rule in *Rohrbough* cannot apply. *See supra* note 7.

unexpectedly. The task of sorting through Shaffer's effects at the home office fell to Rutta as president and personal friend. Rutta found the letter among the items on Shaffer's desk, and he promptly contacted Spriggs. Rutta and Spriggs discussed the latter's concerns, prompting Rutta to offer Spriggs the choice of transferring to another store in Annapolis. By letter of February 25, 1997, Spriggs rejected the transfer offer as imposing additional expense and inconvenience, and he expressed his reluctance at resuming his duties alongside Stickell.

Diamond responded in writing on February 27, 1997, through its Director of Human Resources, who assured Spriggs that Stickell would be terminated if he engaged in further harassment or attempted to retaliate against Spriggs in any way. Spriggs accepted these assurances and returned to the Forestville store on March 10, 1997. There he encountered Stickell and Frank Gilcken, the District Sales Manager, who had been sent by Diamond to oversee the process. Spriggs waited for two hours outside Stickell's office, while Stickell and Gilcken conferred therein.

Gilcken carried with him a list of duties that Diamond expected Spriggs to assume as a condition of his re-employment as a customer service representative. Prior to Spriggs's arrival, Stickell "spoke in a gloating manner" concerning these duties, and he laughed in anticipation of Spriggs's consternation at performing them. J.A. 122. The list specified that the duties were to be completed by noon each day, a deadline that even Stickell acknowledged was unrealistic:

> I'm shaking my head because all this wouldn't be done before noon. This is something a CSR would do all through the day, not before noon. So I don't know where that came from. I have never heard of that. As a manager, I can do all this stuff by 12 o'clock. Usually a CSR is an all day job, 8:00 to 5:00.

J.A. 133. When Stickell presented Spriggs with the list, Spriggs ended the meeting and asked to be taken home. Spriggs left the store, never to return.

b.

A rational trier of fact could readily conclude that Shaffer, upon his discovery in December 1996 that Stickell was continuing to conduct himself inappropriately, unreasonably failed to take corrective action. As a result of Shaffer's indifference, Spriggs was forced to endure Stickell's harassment until February 1997. Although Rutta thereafter proposed to remedy the situation at the Forestville store, a jury could reasonably infer from the events surrounding Spriggs's attempted return that Rutta's efforts were insincere. Because Diamond has failed to demonstrate that, as a matter of law, it acted with reasonable care to promptly correct Stickell's harassing behavior, it has not proved itself entitled to the affirmative defense announced by the Supreme Court in *Ellerth* and *Faragher*. The district court therefore erred in awarding summary judgment to Diamond on Spriggs's hostile work environment claims arising from his second term of employment.

IV.

Spriggs contends that his lockout by Stickell on Monday, February 10, 1997, was in retaliation for the telephone conversation the previous Friday, during which Spriggs asserted his rights under § 1981 by complaining to Shaffer about Stickell's behavior.[14] To prove a prima facie case of retaliation, Spriggs must show that (1) he engaged in protected activity; (2) he suffered an adverse employment action at the hands of Diamond; and (3) Diamond took the adverse action because of the protected activity. *See Gibson v. Old Town Trolley Tours of Washington, D.C., Inc.*, 160 F.3d 177, 180 (4th Cir. 1998). Once Spriggs establishes the elements of his prima facie case, the burden shifts to Diamond to proffer evidence of a legitimate, non-discriminatory reason for taking the adverse employment action. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 120 S. Ct. 2097, 2106 (2000) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)); *Hawkins*, 203 F.3d at 281 n.1 (applying *McDonnell Douglas* framework to § 1981 retaliation claims).

---

[14]Because Spriggs neglected to mention this claim in his EEOC charge, he cannot seek redress pursuant to Title VII. Instead, he may only proceed under § 1981. *See supra* note 4.

Spriggs has sufficiently shown that he asserted his rights under § 1981 by attempting to induce Shaffer to initiate corrective action against Stickell. The evidence, taken in the light most favorable to Spriggs, would also support a finding that the lockout was an adverse employment action, i.e., a suspension, instead of a mere denial of access to a former employee. *See supra* Part III.B.2. Because the lockout occurred hot on the heels of the protected activity, it would be eminently reasonable to infer that the latter engendered the former. Indeed, this conclusion is bolstered by the February 10, 1997 letter that Spriggs wrote after the lockout. In describing the events of that morning, Spriggs told Shaffer, "You were absolutely correct in informing me . . . that Mr. Stickell would now ride me a lot harder after our three-way conversation on Friday." J.A. 127. Spriggs added that, upon his return home, "Mr. Stickell telephoned and stated to me that he was not going to change and that nothing is going to change at the Forrestville [sic] location." J.A. 128.

All of the elements of the prima facie case thus stand adequately proved at this stage of the proceedings. For its part, Diamond has not yet attempted to proffer a legitimate, non-discriminatory reason for its adverse employment action, instead relying on its position that the lockout constituted no such action. Inasmuch as Diamond has not proved its position to be correct as a matter of law, it is not entitled to summary judgment on the retaliation claim.

V.

Lastly, we address Spriggs's contention that the events of March 10, 1997, culminating in his receipt of the lengthy list of new job responsibilities, resulted in his constructive discharge from Diamond. To sustain his claim, Spriggs must demonstrate that Diamond "deliberately made his working conditions intolerable in an effort to induce him to quit." *Amirmokri v. Baltimore Gas & Elec. Co.*, 60 F.3d 1126, 1132 (4th Cir. 1995) (citations and internal quotation marks omitted).

Stickell's own testimony regarding the nature of the assigned tasks, *see supra* Part III.B.2.a, permits a reasonable inference that Spriggs would have returned to intolerable working conditions. Moreover, a jury could reasonably conclude that Stickell's laughing and gloating in connection with the duty list evidenced the requisite intent on Dia-

mond's part. Though the list did not originate with Stickell, he presented it to Spriggs with Gilcken's approval, and it was exceedingly clear to all concerned that Stickell would be charged with ensuring that Spriggs adhered to his new assignments. To be sure, a jury would not be compelled to find a constructive discharge under these circumstances, but neither would it act unreasonably in doing so. The district court's grant of summary judgment was therefore inappropriate.

## VI.

Genuine issues of material fact abound throughout this case concerning almost every aspect of the claims advanced by Spriggs. Consequently, we vacate the district court's entry of summary judgment for Diamond with respect to Spriggs's claims pursuant to § 1981 and Title VII for a hostile work environment arising out of his second term of employment, and for constructive discharge. We likewise vacate the judgment below as to Spriggs's other claims under § 1981 for a hostile work environment arising out of his first term of employment, and for retaliation. The case is remanded to the district court for trial.[15]

*VACATED AND REMANDED*

---

[15]Spriggs has requested that, on remand, venue be transferred to the Greenbelt Division of the District of Maryland. Spriggs has not shown, however, that he will be substantially inconvenienced by the case being tried in the Baltimore Division; we thus deny his request.