Helen **OLEYAR**, Plaintiff,

v.

**COUNTY OF DURHAM**, Defendant.

No. 1:02 CV 00969.

United States District Court, M.D. North Carolina.

Sept. 1, 2004.

Helen Oleyar, Durham, NC, pro se.

Curtis O. Massey, II, Durham Co. Attorney's Office, Durham, NC, for Defendant.

*MEMORANDUM OPINION*

OSTEEN, District Judge.

Plaintiff Helen Oleyar initially filed this action against the County of Durham ("the County") asserting claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), 42 U.S.C. §§ 1981 and 1983, the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et*

*seq.* ("ADEA"), the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601, *et seq.* ("FMLA"), and state common law claims for wrongful discharge and negligent infliction of emotional distress.[1] Now pending before the court is the County's motion for summary judgment. For the reasons stated herein, the County's motion for summary judgment will be granted.

## I. FACTUAL BACKGROUND

Oleyar, a white female over 50 years old, held an entry level position in the County's Purchasing Department from 1994 through 2001. Her regular duties consisted of maintaining a database of approved vendors, tracking and ordering gasoline purchases, obtaining and updating license plates, and paying bills incurred by the Purchasing Department. In September 2001, Karen Wimbish, a black female, was hired as the Purchasing Manager and became Oleyar's supervisor.

Oleyar began experiencing conflict with Wimbish soon after Wimbish took over managerial responsibilities. Wimbish treated Oleyar disrespectfully and often spoke to her in a derogatory manner. During Oleyar's tenure, Oleyar was the only white employee under Wimbish's supervision and the only person over fifty years of age working directly for Wimbish.

Wimbish's conduct toward Oleyar differed from her treatment of other employees. Wimbish would often speak with employees as she entered in the mornings, but would not speak with Oleyar. On other occasions, Wimbish accused Oleyar of being rude, yelled at her, and once accused her of trying to break into her office.

Adjustments were made by Wimbish to Oleyar's work responsibilities, including taking away Oleyar's job of opening the mail, requiring that all bills cross Wimbish's desk before being sent to Oleyar, and restricting Oleyar from making trips to the Department of Motor Vehicles ("DMV").

Other employees also noticed Wimbish's conduct. Marcia Margoutta testified, after hearing a conversation between Wimbish and Oleyar, that "I just recall Karen Wimbish coming—saying something to her, work-related of course, but in such a derogatory and mean-spirited way that it took me aback .... I even thought to myself that—that is really no way to treat someone regardless of whether they're your subordinate or—not." (Margoutta Dep. at 11.) Vickie Jones testified that "when there would be several people coming and going, she would speak—or she was always with people from her department is the usual thing when she came in. And she would not speak to any of the white people that may be milling around in my area or whatever. It was noticeable."[2] (Jones Dep. at 19.)

In addition to Wimbish's generally negative attitude toward Oleyar, Wimbish and Oleyar clashed over Oleyar's duties. During 2001, a period in which Oleyar contracted bronchitis and pneumonia, the database of vendors became out of date. Wimbish allowed Oleyar to perform work over the weekends, with the expectation that the database would be updated by early November 2001. In October, a coworker of Oleyar's, Jonathan Hawley, was

---

1. Oleyar has abandoned her Family and Medical Leave Act and negligent infliction of emotional distress claims. (Pl.'s Mem. Law Opp'n Def.'s Mot. Summ. J. at 4 n. 1.) Therefore, these claims are dismissed and will not be addressed by the court.

2. Jones' statement is the subject of one of the County's motions to strike. Neither this statement, nor any other statement subject to a motion to strike, is considered by the court in its analysis. Therefore, as indicated below, the County's motion, along with all of its other motions to strike, will be dismissed as moot.

transferred to the Finance Department. As a result, Oleyar was assigned Hawley's prior duties and was directed to transfer her work location to the front desk. On October 26, 2001, Wimbish gave Oleyar a written warning for allegedly refusing to relocate to the front desk on the prior day. In the events surrounding the directive to relocate, Oleyar verbally stated her intent to resign. After receiving the warning, Oleyar spoke with Elaine Hyman of the Human Resources department regarding some of the problems she was having with Wimbish, although no discernable action was taken.

In November 2001, Wimbish gave Oleyar a performance evaluation. Oleyar's overall score was "Needs Improvement." (Oleyar Aff. ¶ 18.) On December 7, 2001, Oleyar received another written warning from Wimbish, accusing her of unsatisfactory job performance in her delayed response to a letter from the DMV regarding a potential fine. Oleyar was further accused of not following a directive from Wimbish to wait until the following day to address the DMV issue.

On December 14, 2001, Oleyar received a termination letter from George Quick, Finance Director for the County of Durham. Oleyar's appeal of her termination was upheld by County Manager Michael Ruffin after a hearing in which testimony was received from Susan Fox–Kirk, George K. Quick, Karen Wimbish, Anthony M. Allen, and Yolanda Moore–Gaddy.[3] During the hearing, Oleyar had an opportunity to cross-exam witnesses and make opening and closing statements.

Following the denial of her appeal, Oleyar filed a charge of discrimination with the Equal Employment Opportunity Commission, alleging age and race discrimination.

In the course of her tenure under Wimbish and during the termination process, Oleyar never alleged that she was the victim of age or race discrimination, nor did she avail herself of the County's discrimination grievance procedures. Furthermore, Oleyar concedes that neither Ruffin, Quick, nor Fox–Kirk engaged in intentional discrimination against her based on her race or age.

## II. ANALYSIS

### A. Standard of Review

Summary judgment is appropriate where an examination of the verified pleadings, affidavits, and other proper discovery materials before the court demonstrates that there is no genuine issue of material fact, thus entitling the moving party to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Where such evidence could lead a reasonable juror to find for the party opposing summary judgment, a genuine issue of material fact exists and summary judgment may not be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). In deciding whether there is a genuine issue of material fact, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in his favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). The basic question in a summary judgment inquiry is whether the evidence "is so one-

---

**3.** Fox–Kirk was the Deputy Finance Director of the Finance Department. Quick was the Finance Director for the County. Allen was Interim Purchasing Director for the County from October 2000 through August 2001, and served as Oleyar's manager prior Wimbish's tenure. Moore–Gaddy was the Business Development Manager of the Purchasing Department.

sided that one party must prevail as a matter of law." *Id.* at 252, 106 S.Ct. at 2512.

### B. Discriminatory Discharge under Title VII, § 1981, and the Age Discrimination in Employment Act

■ To succeed on a claim under Title VII, § 1981 or the ADEA, a plaintiff must prove discriminatory intent on the part of the defendant. *See Goldberg v. B. Green and Co.,* 836 F.2d 845, 847–48 (4th Cir. 1988); *Moore v. City of Charlotte,* 754 F.2d 1100, 1105 (4th Cir.1985). A plaintiff may prove discriminatory intent by way of direct evidence, such as statements by the defendant, or through circumstantial evidence. *Id.* (citing *United States Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 714 n. 3, 103 S.Ct. 1478, 1481 n. 3, 75 L.Ed.2d 403 (1983)). In the present case, Oleyar has presented no direct evidence of discrimination based on Oleyar's race and, as such, typically the *McDonnell Douglas* burden-shifting analysis would apply to her claims. In this case, though, Oleyar has not sufficiently alleged discriminatory intent relating to her termination.

■ Title VII prohibits employers from making an adverse employment action, in this case, termination, on the basis of race. A termination decision is motivated by racial discrimination when the individual(s) with decision-making authority act with racial animus. *See Hill v. Lockheed Martin Logistics Mgmt., Inc.,* 354 F.3d 277, 291 (4th Cir.2004) (en banc). The Fourth Circuit has held that "an aggrieved employee who rests a discrimination claim under Title VII or the ADEA upon the discriminatory motivations of a subordinate employee must come forward with sufficient evidence that the subordinate employee possessed such authority as to be viewed as the one principally responsible for the decision or the actual decisionmaker for the employer." *Id.* at 291.

Oleyar acknowledges that Quick, the Department head, after consultation with Fox–Kirk, the Deputy Finance Director, made the initial termination decision. Additionally, Oleyar's internal appeal of her termination was heard by Ruffin, the County Manager, in a forum permitting Oleyar to openly contest the specified bases for her termination.[4] However, Oleyar's allegations of discrimination are leveled completely at Karen Wimbish, Oleyar's supervisor.

When asked during Oleyar's deposition whether race was a factor motivating Quick's termination decision, she indicated "race was ... indirectly a cause for him." (Oleyar Dep. at 136.) Oleyar explained that the motivation was indirect because Quick believed Wimbish's statements to him regarding Oleyar's performance. (*Id.*) When asked whether there was any other evidence Oleyar could identify indicating a racial motivation on the part of Quick, Oleyar responded, "I can't point to anything else." (*Id.*)

■ A conclusion that Quick's termination decision was racially motivated based solely on the accusation that Quick believed Wimbish's statements is unsupported. Finding that Oleyar's termination was racially motivated would require the

---

4. In a letter, dated December 14, 2001, Quick wrote to Oleyar that the termination decision was based on

(1) Two disciplinary warnings for unsatisfactory job performance and unsatisfactory personal conduct[;] (2) An overall performance appraisal rating of 'Needs Improvement' for the past 12 months[;] (3) Your stated declaration in a meeting on December 4th with myself, the Deputy Finance Director and the Purchasing Manager, that you could not do more to improve your performance.

(Oleyar Dep. Ex. 2.) The letter additionally cited Oleyar's failure to follow the informal bid process. (*Id.*)

court to hold that, although the termination decision was formally processed by Quick and Ruffin, the actual decision was made by Wimbish. Although the court in *Hill* did suggest that a decisionmaker's rubber stamping of a supervisor's advice could support a finding of racial discrimination, 354 F.3d at 290, the evidence indicates that Quick's decision was not solely dependent on Wimbish's allegations. Rather, Quick conducted a counseling session with Oleyar on December 4, ten days prior to her dismissal. (Oleyar Dep. Ex. 2.)

The connection between Wimbish's actions and the termination decision is further attenuated upon considering the appeal process conducted before Ruffin, the County Manager. During the appeal hearing, Ruffin received testimony from Oleyar, Quick, Fox–Kirk, Wimbish, and others and allowed Oleyar to question witnesses and contest the bases for her termination. After the hearing, Ruffin upheld Oleyar's termination.

Oleyar puts forth no evidence of a racially discriminatory motive on the part of Quick, Ruffin, or Fox–Kirk, the persons who had actual decision-making authority. In response to the question, "Do you think your age and race mattered to the County Manager?" Oleyar responded, "No." (*Id.* at 141.) When asked whether Fox–Kirk had "any animosity toward [her]," Oleyar responded, "No. I don't see why. We worked well for years." (*Id.* at 157.) The only evidence of racial discrimination Oleyar alleges is that Quick, Fox–Kirk, and Ruffin believed what Wimbish told them. (*See id.* at 136, 142, 157–58.) Considering that an independent review was conducted

by both Quick and Ruffin before either termination decision, there is no basis for imputing Wimbish's alleged discriminatory motive to Quick or Ruffin. Oleyar's claims fail as a matter of law and therefore judgment will be granted as to Oleyar's discriminatory discharge claims under Title VII, § 1981, and the ADEA.

C. Hostile Work Environment

 To prove her claim of a hostile work environment under Title VII or the ADEA, Oleyar must show that the alleged harassment was (1) unwelcome, (2) based on her race or age, (3) sufficiently severe or pervasive to alter the conditions of her employment and create an abusive atmosphere, and (4) attributable to the County. *See Causey v. Balog,* 162 F.3d 795, 801 (4th Cir.1998); *see also Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986) (stating that conduct is actionable only if it is "sufficiently severe or pervasive 'to ... create an abusive working environment.'") (internal quotations omitted). An affirmative defense is available to an employer who shows "(a) that the employer exercised reasonable care to prevent and correct promptly any ... harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher v. City of Boca Raton,* 524 U.S. 775, 807, 118 S.Ct. 2275, 2293, 141 L.Ed.2d 662 (1998). The Fourth Circuit has indicated that the defense is applicable to "the full range of harassment claims covered by Title VII." *Spriggs v. Diamond Auto Glass,* 242 F.3d 179, 186 n. 9 (4th Cir.2001).[5] The Court in *Faragher*

---

**5.** The affirmative defense is also applicable to § 1981 hostile work environment claims. *Carson v. Giant Food, Inc.,* 187 F.Supp.2d 462, 479 (D.Md.2002). Additionally, the defense is logically extended to claims under the ADEA. The Fourth Circuit has held that a

hostile work environment claim is actionable under the ADEA. *Fox v. General Motors Corp.,* 247 F.3d 169, 176 (4th Cir.2001) (holding that the similarity of purpose and language between the ADEA and Title VII supports recognition of hostile work environment claims in

limited the defense by stating that "[n]o affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment." *Id.* at 808, 118 S.Ct. at 2293.

■ Oleyar contends that the defense is inapplicable due to the limiting language in the *Faragher* case. The court finds that the defense is applicable in the instant case and effectively forestalls Oleyar's hostile work environment claim. While the Court did indicate that the defense will not lie where "harassment culminates in a tangible employment action," as the discussion above demonstrates, the employment action against Oleyar was taken apart from and on different grounds than the alleged harassment. *Id.* Therefore, it cannot be said that the harassment *culminated* in termination. In fact, of the reasons listed for Oleyar's termination, none of them directly implicated Oleyar's relationship with Wimbish. *See Lissau v. Southern Food Serv., Inc.,* 159 F.3d 177, 182 (4th Cir.1998) ("Tangible employment actions, if not taken for discriminatory reasons, do not vitiate the affirmative defense.").

■ Concerning the first prong of the defense, the presence of an effective anti-harassment policy weighs strongly in favor of the employer's reasonable care. *Brown v. Perry,* 184 F.3d 388, 396 (4th Cir.1999) ("[W]here ... there is no evidence that an employer adopted or administered an anti-harassment policy in bad faith or that the policy was otherwise defective or dysfunctional, the existence of such a policy militates strongly in favor of a conclusion that the employer 'exercised

reasonable care to prevent' and promptly correct sexual harassment.") (quoting *Faragher,* 524 U.S. at 807, 118 S.Ct. at 2293). Defendant has policies in place prohibiting discrimination as well as a grievance and appeals process. (Hyman Aff. Exs. B, C, D, E.) Oleyar was familiar with Defendant's anti-discrimination policies and procedures as she had filed a discrimination complaint in 1996. (Hyman Aff. Ex. A.) Therefore, the court concludes that Defendant exercised reasonable care to prevent and promptly correct harassing behavior through an anti-discrimination policy of which Oleyar was apprized.

Furthermore, in establishing the second prong of the defense, Defendant has produced evidence that Oleyar failed to take opportunities provided by Defendant for preventive or corrective action. Oleyar never filed a formal grievance alleging discrimination. During the following interactions with management, Oleyar never expressed any complaint regarding discrimination: (1) a consultation with Fox–Kirk on October 26, 2001, after Oleyar was asked by Wimbish to relocate her work station to the front desk; (2) Oleyar's written reply responding to her performance evaluation of November 19, 2001; (3) a meeting on December 4, 2001, between Oleyar, Quick, Wimbish, and Fox–Kirk regarding failure to timely perform duties; (4) a pre-dismissal conference on December 12, 2001, with Fox–Kirk and Wimbish; (5) Oleyar's notice of appeal of her termination dated January 14, 2002; (6) Oleyar's appeal before the County Manager on March 18, 2002. (Hyman Aff. ¶¶ 7–8; Pl.'s Dep. at 246.) Oleyar failed to take the opportunities provided by Defendant to take preventive

---

the context of the ADEA). Because of the similarities between the remedial schemes of the ADEA and Title VII, the court will also extend the affirmative defense recognized in *Faragher* to Oleyar's hostile work environ-

ment claim under the ADEA. *See, e.g., Breeding v. Arthur J. Gallagher and Co.,* 164 F.3d 1151, 1158 (8th Cir.1999); *Lacher v. West,* 147 F.Supp.2d 538, 543–44 (N.D.Tex.2001).

or corrective action. Therefore, Defendant has successfully raised an affirmative defense to Oleyar's hostile work environment claims under Title VII, § 1981, and the ADEA, and summary judgment will accordingly be granted as to these claims.[6]

### D. Wrongful Discharge

 Finally, Oleyar alleges a claim for wrongful discharge. A wrongful discharge claim must establish that the discharge was in violation of public policy by showing that "the employee was discharged (1) for refusing to violate the law at the employer's request, (2) for engaging in a legally protected activity, or (3) based on some activity by the employer contrary to law or public policy." *Ridenhour v. IBM Corp.*, 132 N.C.App. 563, 568–69, 512 S.E.2d 774, 778 (citations omitted). Where a claim for wrongful discharge is made against a state or its political subdivisions, though, sovereign immunity may prevent a plaintiff from proceeding on such claim. Sovereign immunity protects the state against tort claims when the state's actions are governmental, rather than proprietary. *Rhodes v. Asheville*, 230 N.C. 134, 137, 52 S.E.2d 371, 373 (1949).

 In analogous cases, North Carolina courts have found that the termination of state or county employees constitutes a governmental function. *See Phillips v. Gray*, 163 N.C.App. 52, ──, 592 S.E.2d 229, 232 (2004) (holding that officer who cooperated with federal officials in investigation of sheriff was barred by sovereign immunity from pursuing a claim against sheriff in his official capacity after plaintiff was subsequently discharged); *Paquette v. County of Durham*, 155 N.C.App. 415, 419, 573 S.E.2d 715,

717 (2002) (holding that claim for wrongful termination in violation of public policy based on alleged racial discrimination was barred by sovereign immunity); *see also Aune v. University of North Carolina at Chapel Hill*, 120 N.C.App. 430, 436, 462 S.E.2d 678, 683 (1995) (plaintiff's claims for emotional distress and misrepresentation surrounding his non-renewal as associate dean were barred by sovereign immunity). Therefore, Defendant's motion for summary judgment will be granted as to Oleyar's wrongful discharge claim.

### III. CONCLUSION

For the reasons set forth above, the court will grant the County's Motion for Summary Judgment. All of the County's motions to strike proffered testimony will be dismissed as moot. Furthermore, motions by the County for Judgment on the Pleadings, to Dismiss Plaintiff's Fifth and Sixth Causes of Action, and to Compel Introduction of Complete Record Statements will be dismissed as moot.

A judgment in accordance with this memorandum opinion shall be filed contemporaneously herewith.

### JUDGMENT

For the reasons set forth in the memorandum opinion entered contemporaneously herewith,

IT IS ORDERED AND ADJUDGED that Defendant's Motion for Summary Judgment [36] is GRANTED.

IT IS ORDERED that the following motions by Defendant are dismissed as moot:

---

6. The court further notes there is no evidence, besides conclusory statements of co-workers, that Oleyar was the victim of age discrimination. In fact, one of her co-workers, Hilda Williams, was also within the protected class for purposes of the ADEA and yet Williams has stated "[d]uring the time that she was my supervisor, Karen Wimbish respected me and I respected her." (Williams Aff. ¶ 4.)

1. For Judgment on the Pleadings Pursuant to Rule 12(c) as to Plaintiff's Second, Fifth and Sixth Causes of Action [26];

2. To Dismiss Plaintiff's Fifth and Sixth Causes of Action Pursuant to Rule 12(b)(2) [27];

3. To Compel Introduction of Complete Record Statements [60].

IT IS FURTHER ORDERED that the following motions by Defendant to strike proffered testimony are dismissed as moot:

1. The Self–Serving Affidavit of Plaintiff as to Her Own Performance and the Grounds for Her Termination and Interpersonal Difficulties with Ms. Wimbish [61];

2. The Proffered Testimony of Plaintiff Concerning an Overheard Conversation Cited in Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment [62];

3. The Proffered Testimony of Ms. Kimberly Cook Concerning an Overheard Conversation Cited in Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment [63];

4. The Proffered Testimony of Ms. Marcia Margoutta Concerning an Overheard Conversation City in Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment [64];

5. The Proffered Testimony of Ms. Vickie Jones that Plaintiff was the Victim of Discrimination Cited in Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment [65];

6. The Proffered Testimony of Ms. Kimberly Cook That Plaintiff Was the Victim of Discrimination Cited in Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment [66];

7. The Proffered Testimony of Ms. Marcia Margoutta that Plaintiff Was the Victim of Discrimination Cited in Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment [67];

8. The Proffered Testimony of Plaintiff Concerning an Overheard Conversation Cited in Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment [68];

9. The Proffered Testimony of Ms. Kimberly Cook Concerning an Overheard Conversation Cited in Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment [69];

10. The Proffered Testimony of Ms. Marcia Margoutta Concerning an Overheard Conversation Cited in Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment [70].