Ronald W. PARKINSON

v.

**ANNE ARUNDEL MEDICAL CENTER, INC., et al.**

No. CIV. JFM–01–CV–1628.

United States District Court, D. Maryland.

Aug. 5, 2002.

512

Robin R. Cockey, Cockey Brennan and Maloney, Salisbury, MD, for Plaintiff.

Paul M. Lusky, Kruchko and Fries, Baltimore, MD, for Defendants.

## MEMORANDUM

MOTZ, District Judge.

Plaintiff Ronald W. Parkinson, former chief ultrasound technician at Anne Arundel Medical Center, Inc. ("AAMC") has sued the medical center for violating the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* Parkinson also has brought common law claims of intentional infliction of emotional distress and invasion of privacy against AAMC and two of his former supervisors, Bonnie Poznanski and Cynthia Wilson.[1] The defendants have moved for summary judgment. For the reasons set forth below, the motion will be granted as to the ADA claim, which is Count I. Because I decline to exercise supplemental jurisdiction over the other two claims, they will be dismissed without prejudice.

## I.

Parkinson had been employed by AAMC for more than 26 years when he left abruptly in February 2000 due to heart problems. He began his career at the medical center in 1974 as a radiology technician and was promoted in 1980 to supervisor of AAMC's Ultrasound Department. His job title subsequently changed to chief of the Ultrasound Unit within the Radiology Department. In June of 1998, Parkinson suffered a heart attack. After several months of recuperation, he returned to work. The events giving rise to this complaint occurred in the period between Parkinson's return to work in September 1998 and his departure from AAMC in February 2000.

The sole federal claim in Parkinson's three-count complaint alleges a violation of the ADA by AAMC. Parkinson asserts that the medical center refused to honor his request that he avoid overtime work after his heart attack, thereby failing to accommodate his disability of severe coronary artery disease. He also argues that AAMC discriminated against him by demoting and disciplining him as a result of an incident on December 15, 1999. On that day, Poznanski, the manager of the Radiology Department, insisted that Parkinson work overtime to perform a carotid ultrasound test on a hospital patient. When Parkinson refused, Poznanski suspended him for one day without pay. Thereafter, Parkinson states, he was demoted to senior ultrasound technician.

The other two counts of Parkinson's complaint, alleging common law tort claims, arise from the events of February 4, 2000, Parkinson's last day of work at AAMC. According to Parkinson, Wilson, a supervisor, told him that he would have to work a double shift that day to cover for an employee who had called in sick. Parkinson said he could not do so for medical reasons. The two argued, and Parkinson began feeling ill. He left work and went to see an employee health nurse, who told him to go to the emergency room. He was evaluated there for a possible second heart attack.[2] While Parkinson was in the emergency room, Poznanski called, speaking

---

1. Cynthia Wilson was formerly known as Cynthia Carr and is referred to as "Carr" in plaintiff's complaint and throughout the record. She will be referred to in this opinion as "Wilson."

2. Dr. Elizabeth M. Kingsley, who treated Parkinson in AAMC's emergency room, indicated in a report that he experienced "chest pain very similar to that[] which was associated with" his first heart attack, but she testified that "[t]here was no definite evidence of heart attack." (Kingsley Dep. at 31; Kingsley Dep. Ex. 2.)

first to the emergency room nurse and then to Parkinson. According to Parkinson, she told him that he had to return to work unless he had a doctor's note and that if he did not, he could face disciplinary action. Parkinson ended the call by hanging up on Poznanski. He then discharged himself from the emergency room against the emergency room doctor's advice and immediately took medical leave, never returning to AAMC.[3]

## II.

### A.

In order to establish his claims of disability discrimination and failure to accommodate under the ADA, plaintiff must prove as a threshold matter that he was disabled within the meaning of the Act. *See* 42 U.S.C. § 12112(a). The Act defines "disability" to include: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). Plaintiff argues both that he was actually disabled and that AAMC regarded him as disabled.

### 1.

■ To be disabled under 42 U.S.C. § 12102(2)(A), a plaintiff must have a "'physical or mental impairment'" that

"'substantially limits'" one or more "'major life activities.'" *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 479, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999) (*quoting* 29 C.F.R. § 1630.2(h)-(j) (1998)). The defendants do not dispute that plaintiff suffers from severe coronary artery disease or that this disease could constitute a physical impairment under the ADA. Rather, they argue that plaintiff does not qualify as disabled because he was not substantially limited in a major life activity from September 1998 to February 4, 2000.[4] Plaintiff makes two arguments in response: first, that his inability to work overtime substantially limited his ability to work, and second, that he was substantially limited in his ability to engage in "basic movements of daily life" such as "lifting, bending, running or other non-sedentary physical activities ...." (Pl.'s Opp'n at 4–5.)

Assuming without deciding that working is a major life activity under the ADA,[5] I cannot find that plaintiff was substantially limited in his ability to work merely because he could not work overtime. Plaintiff has presented no case law that suggests such an argument is legally cognizable. To the contrary, courts have uniformly held that "an inability to work overtime is not a substantial limitation on the ability to work." *Cotter v. Ajilon Servs., Inc.*, 287 F.3d 593, 598 (6th Cir.

---

**3.** According to AAMC's vice president for human resources, Parkinson was entitled to remain on medical leave for one year, after which he was asked if he could return to work "in any capacity." (Phillip Dec. ¶ 2.) When Parkinson failed to respond, he was discharged from his job. (*Id.* ¶ 3.) He is, however, entitled to continue receiving long term disability benefits until he reaches age 65 or is no longer disabled. (*Id.*)

**4.** Plaintiff has indicated that his health deteriorated after he left AAMC. (*See* Parkinson Aff. ¶ 15.) However, the time period relevant to

his ADA claim is the time during which he was employed at the medical center and in which he alleges it failed to accommodate his disability and discriminated against him based on his disability.

**5.** The Supreme Court has declined to decide this issue, but has evaluated working as if it constitutes a major life activity. *See Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 122 S.Ct. 681, 692, 151 L.Ed.2d 615 (2002); *Sutton*, 527 U.S. at 492, 119 S.Ct. 2139.

2002); *see also Kellogg v. Union Pac. R.R. Co.*, 233 F.3d 1083, 1087 (8th Cir. 2000) (holding that employee limited to forty-hour work week was not substantially limited in his ability to work); *Tardie v. Rehab. Hosp. of Rhode Island*, 168 F.3d 538, 541–42 (1st Cir.1999) (holding that employee who was "regarded ... as having an impairment that prevented her from working more than forty hours per week" was not disabled); *Colwell v. Suffolk County Police Dep't*, 158 F.3d 635, 645 (2d Cir.1998) (finding plaintiff who was urged to limit overtime and avoid stress and confrontation did not establish that his ability to work was substantially limited); *Manson v. Gen. Motors Corp.*, 2001 WL 1247644, at *11 (N.D.Ill.2001) (explaining that "working as a major life activity must be analyzed generally over a broad range of jobs, instead of focusing on particular aspects of a job, such as working overtime"); *Doebele v. Sprint Corp.*, 157 F.Supp.2d 1191, 1211 (D.Kan. 2001) (collecting cases); *Overton v. Tar Heel Farm Credit*, 942 F.Supp. 1066, 1070 (E.D.N.C.1996) (finding that employee who could work up to 45 hours a week failed to state a claim that he was regarded as disabled).

Even if an inability to work overtime could substantially limit one's ability of work, plaintiff still would have to establish that his inability to work overtime precluded him from performing a broad range of jobs, and not just from performing his particular job. *See Sutton*, 527 U.S. at 493, 119 S.Ct. 2139; *Murphy v. United Parcel Serv., Inc.*, 527 U.S. 516, 525, 119 S.Ct. 2133, 144 L.Ed.2d 484 (1999). He has failed to do this. Although plaintiff states that his inability to work overtime would disqualify him from numerous jobs in the health care profession (*see* Pl.'s Opp'n at 5), he has presented no evidence on this point. As the Supreme Court recently explained, it is not enough for an ADA plaintiff to "merely submit evidence of a medical diagnosis of an impairment." *Toyota*, 122 S.Ct. at 691. "Instead, the ADA requires those 'claiming the Act's protection ... to prove a disability by offering evidence that the extent of the limitation [caused by their impairment] in terms of their own experience ... is substantial.'" *Id.* at 691–92 (*quoting Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 567, 119 S.Ct. 2162, 144 L.Ed.2d 518 (1999)).

Plaintiff's argument that he was substantially limited in the major life activities of lifting, bending, and running is similarly without merit. As an initial matter, it is unclear that neither running or bending (except to the extent bending affects one's ability to work) would constitute major life activities under the ADA. *See Billings v. Taylor Royall, Inc.*, 2000 WL 490734, at *4 (D.Md.2000) (noting that running and "having a capacity for physical exertion" are not included among major life activities); *Petty v. Freightliner Corp.*, 123 F.Supp.2d 979, 982 (W.D.N.C.2000) (holding that restrictions on bending and running "do not qualify as substantially limiting[ ] a major life activity other than work"). Even assuming they are major life activities, however, plaintiff has presented no evidence that his abilities to run and bend were substantially limited, or affected his life or work in any way, between the time he returned to work after his first heart attack and the time he took medical leave from AAMC.

Unlike bending and running, lifting has been identified as a major life activity under the ADA. *See* 29 C.F.R. pt. 1630, App. § 1630.2(i) (2002). However, I cannot find on this record that plaintiff has demonstrated that he was substantially limited in his ability to lift. Plaintiff acknowledged that between his first heart attack and February 4, 2000 he was able to engage in

"light" weightlifting for exercise, and was only "prohibited from lifting heavy weights and [doing] strenuous exercise." (Parkinson Dep. at 240; Parkinson Aff. ¶¶ 4, 15.) He has presented no evidence to indicate that his ability to lift was substantially limited compared to the ability of the general population, as the ADA requires. *See* 29 C.F.R. § 1630.2(j)(1) (2002). Further, it already has been established that plaintiff was able to work forty-hour weeks without problem despite this perceived limitation. Plaintiff therefore has failed to establish that he was substantially limited in his ability to lift. *See, e.g., Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 200 (4th Cir.1997), *abrogated on other grounds by Baird v. Rose*, 192 F.3d 462 (4th Cir.1999) (rejecting ADA claim in which plaintiff provided "absolutely no indication that [his] lifting restriction significantly limit[ed] his ability to perform a wide range of jobs"); *Palov v. Ikon Office Solutions, Inc.*, 2001 WL 13238, at *5 (D.Md.2001) ("Unless losing the ability to lift restricts an individual from an entire class of jobs, . . . a lifting limitation typically does not qualify as a disability under the ADA . . . ."). Because plaintiff has not shown that he was substantially limited in a major life activity, he does not qualify as actually disabled under the ADA.[6]

2.

■ As an alternative to proving he was actually disabled, plaintiff argues that AAMC regarded him as disabled pursuant to 42 U.S.C. § 12102(2)(C). Plaintiff contends that after he returned to work following his 1998 heart attack, he was removed from "on-call status,"[7] as "reflected by the fact [that] his hours dropped from 70 to 40 a week." (Pl.'s Opp'n at 6.) By removing him from on-call duties, he asserts, AAMC regarded him as substantially limited in the major life activity of working.[8]

■ The Fourth Circuit has explained that "[a]n individual is regarded as being disabled if he is regarded or perceived, albeit erroneously, as having an impairment that substantially limits one or more of his major life activities." *Haulbrook v. Michelin N. Am., Inc.*, 252 F.3d 696, 703 (4th Cir.2001). As was stated previously, it is doubtful whether an inability to work more than forty hours a week—be it over-

---

**6.** Plaintiff's contention that bending, lifting, and running can be combined into a major life activity that he terms "basic movements of daily life" (Pl.'s Opp'n at 4) lacks support. The Supreme Court has indicated that "[n]othing in the text of the [ADA], our previous opinions, or the regulations suggests that a class-based framework should apply outside the context of the major life activity of working." *Toyota*, 122 S.Ct. at 693. Even if "basic movements" as a class were a major life activity, however, plaintiff's case would be no stronger than the sum of its parts. Since I have held that plaintiff has not demonstrated substantial limitations on his ability to run, bend, or lift, he also has not demonstrated a substantial limitation on his ability to engage in these "basic movements of daily life."

**7.** According to a medical center policy statement, an employee from the Ultrasound Unit must be on call for emergencies at all times. (Parkinson Dep. Ex. 16.) The on-call employee is paid a minimal amount ($20) for being on call, and is paged in the event of emergencies, whereupon he reports for work at the medical center and is paid at an hourly rate. (Campbell Dec. ¶ 4; Parkinson Dep. at 177.)

**8.** This argument is ironic, to say the least. After characterizing defendants as "manifestly unsympathetic to his need to moderate the demands of the workplace" (Compl.¶ 8), plaintiff complains that he was discriminated against because he was not given *enough* work in the form of "on-call" duties. Compounding the irony is the fact that plaintiff has testified that Vadj Dubiansky, director of radiological services at AAMC, removed him from the on-call list only after he told Dubiansky that he "was supposed to avoid stress and overwork." (Parkinson Dep. at 214, 225.)

time or on call—constitutes a substantial limitation on a major life activity. If an inability to work in excess of forty hours a week does not constitute a substantial limitation on a major life activity, a litigant cannot be regarded as disabled merely because an employer perceives that he or she is unable to work more than forty hours a week. *See Tardie*, 168 F.3d at 542; *Overton*, 942 F.Supp. at 1070.

Even assuming, however, that the inability to handle on-call assignments could substantially limit the major life activity of working, plaintiff has not proven that AAMC regarded him as disabled in this respect. Although plaintiff testified that Vadj Dubiansky, the director of radiological services at AAMC, removed him from the on-call schedule (Parkinson Dep. at 226), defendants have presented uncontradicted payroll records that show that plaintiff was on call twenty-three times between October 1, 1998 (shortly after his return to work following his first heart attack) and his last day of work at AAMC. (Campbell Dec. ¶ 4 & Attach. 2.) Plaintiff himself acknowledged that he worked on-call duty one Saturday a month. (Parkinson Dep. at 288.) He has not presented any evidence showing that these hours represented a decrease from the on-call hours he worked prior to his first heart attack, or, more importantly, that any decrease was due to a perception by AAMC that he was substantially limited in a major life activity. Plaintiff therefore has failed to establish that he was regarded as disabled under the ADA.

## B.

■ Plaintiff argues that even if he cannot prove he was disabled under the ADA,

he still may maintain a claim of retaliation against AAMC pursuant to 42 U.S.C. § 12203, which states in relevant part: "No person shall discriminate against *any individual* because such individual has opposed any act or practice made unlawful by this chapter . . . ." 42 U.S.C. § 12203(a) (emphasis added).[9] By its plain language, this provision of the ADA does not require as a predicate that the person invoking it be a qualified individual with a disability. *See Rhoads v. Fed. Deposit Ins. Corp.*, 257 F.3d 373, 391 (4th Cir.2001), *cert. denied*, —— U.S. ——, 122 S.Ct. 1309, 152 L.Ed.2d 219 (2002).

To analyze a case of retaliation under the ADA in which, as here, the claimant has not offered sufficient direct or indirect evidence of retaliation, a court must engage in a three-part, burden-shifting analysis. *See id.* First, the court examines whether the plaintiff has made out a prima facie case of retaliation, which consists of three elements: a protected activity by the employee, an adverse action by the employer, and a causal connection between the two. *See id.* at 392. If plaintiff can demonstrate a prima facie case of retaliation, the burden shifts to the employer to offer a legitimate, non-retaliatory reason for the action. *See id.* If the employer does so, the plaintiff must then prove this reason is a pretext for retaliation. *See id.*

Plaintiff contends that by requesting that he not work overtime, he asked for an accommodation under the ADA and therefore engaged in a protected activity. He argues that AAMC retaliated against him by taking two adverse actions: suspending him for one day without pay in December

---

**9.** Although plaintiff did not check the retaliation box on his Equal Employment Opportunity Commission charge of discrimination, his attached narrative was similar to his complaint in this case and could have led the EEOC to investigate a retaliation claim. (*See* Defs.' Reply Ex. G.) I therefore will address the merits of this claim, rather than finding it was not administratively exhausted, as defendants urge.

1999 because he refused to work an overtime shift at Poznanski's request, and demoting him in January 2000 from chief of the Ultrasound Unit to senior ultrasound technician. However, even accepting that plaintiff engaged in protected activity, he has failed to make out a prima facie case of retaliation. First, he has failed to prove that the demotion he alleges constituted an adverse employment action. Second, he has failed to connect his one-day suspension to his protected activity. He also has failed to rebut the legitimate, non-retaliatory reason defendants offered for the suspension.

■ An adverse employment action in the context of a retaliation case "includes any retaliatory act or harassment if, but only if, that act or harassment results in an adverse effect on the 'terms, conditions, or benefits' of employment." *Von Gunten v. State of Maryland,* 243 F.3d 858, 866 (4th Cir.2001) (citation omitted).[10] Plaintiff has not indicated how his alleged demotion affected a term, benefit, or condition of his employment. He testified that although his title changed and he reported to a different supervisor,[11] his pay did not decrease. (Parkinson Dep. at 65, 282–83.) Further, there is no evidence that plaintiff's job duties or assignments changed, or that the alteration in job titles was considered a demotion by anyone other than plaintiff. Changes in employment that merely make a job "less appealing" but that do not affect a term, condition, or benefit of employment are not adverse employment actions. *Von Gunten,* 243 F.3d at 868.

■ Plaintiff's one-day, unpaid suspension, unlike his alleged demotion, could constitute an adverse employment action.[12] *See Spriggs v. Diamond Auto Glass,* 242 F.3d 179, 190 (4th Cir.2001). However, plaintiff has failed to causally connect the suspension and the protected activity. Plaintiff testified that he requested that he not work overtime after he returned to work in September 1998 following his first heart attack. (Parkinson Dep. at 214, 225–26.) He was not suspended until December 1999. The lapse of more than one year between the protected activity and the adverse action does not support an inference of causation. *See Spriggs v. Pub. Serv. Comm'n of Maryland,* 197 F.Supp.2d 388, 398 (D.Md.2002). Further, causation is especially weak in this case because the evidence establishes that the December 1999 confrontation between plaintiff and Poznanski was not the first time plaintiff had been asked to work overtime following his 1998 heart attack: in fact, AAMC payroll records show that he worked overtime in five of seven payroll periods after his return to work in 1998 and in sixteen of twenty-six payroll periods in 1999. (Campbell Dec. ¶ 3 & Attach. 1.) This apparent willingness to work overtime by plaintiff casts doubt on whether his September 1998 request remained val-

---

10. Although *Von Gunten* analyzed adverse employment actions in the context of Title VII, the Fourth Circuit has explained that because the ADA "echoes and expressly refers to Title VII, and because the two statutes have the same purpose—the prohibition of illegal discrimination in employment—courts have routinely used Title VII precedent in ADA cases." *Fox v. Gen. Motors Corp.,* 247 F.3d 169, 176 (4th Cir.2001).

11. Prior to being ordered to report to Wilson, plaintiff had reported directly to Dubiansky. (Parkinson Dep. at 65.)

12. Defendants argue that this suspension did not represent an adverse employment action because they offered to rescind it and instead give plaintiff only a written warning. (*See* Phillip Dep. at 23.) However, since plaintiff refused this offer and served the suspension (*id.* at 24), I will treat the suspension as an adverse employment action.

id. Because plaintiff has not shown that his suspension was causally related to protected activity, he has not established a prima facie case of retaliation.

Furthermore, even if I were to find causation, and thus a prima facie case of retaliation, defendants have offered a legitimate, non-retaliatory reason for the suspension. According to defendants, plaintiff was suspended without pay on December 16, 1999, for refusing a request by Poznanski that he stay after his shift on December 15 in order to complete a carotid ultrasound that a doctor had requested on December 14. (Parkinson Dep. Ex. 27.) The job description for chief ultrasound technician states that he must "[p]erform[ ] ultrasound procedures within designated time frame and in accordance with established quality standards and needs of the patient" and that "[a]t the discretion of Manager or immediate supervisor, [he] may be required to work . . . different shifts . . . ." (Parkinson Dep. Ex. 17 at 2.) AAMC's policies and procedures include an employee handbook, which states that employees are required to work "extra hours" when "the workload demands it," and their supervisor requests it (Parkinson Dep. Ex. 14 at 12), and Personnel Policy 609—Overtime, which states that "employees must work overtime if it is required by the Medical Center," and that refusals could result in discipline. (Parkinson Dep. Ex. 15 at 1.)

Although plaintiff argues that AAMC could have relied upon another employee to conduct the carotid ultrasound, he has not established that AAMC's legitimate reasons for disciplining him were pretextual. Plaintiff acknowledged in his deposition that Poznanski disagreed with him about whether the other employee whom he believed could do the ultrasound was qualified for the assignment. (Parkinson Dep. at 275, 278.) Additionally, plaintiff failed to provide any evidence that Poznanski chose him for the overtime shift because she was attempting to retaliate against him, rather than because he was available, she knew he was qualified to do the assignment, and he was the chief of the unit, and thus ultimately responsible for its work. Accordingly, plaintiff's failure to rebut the legitimate, non-retaliatory reason for his suspension means that no reasonable jury could find he was retaliated against under the ADA. Cf. Haulbrook, 252 F.3d at 707. Therefore, summary judgment as to Count I will be granted to defendant AAMC.[13]

## III.

■ Having dispensed with the sole federal count in plaintiff's complaint, I decline to exercise jurisdiction over the remaining common law claims. See 28 U.S.C. § 1367(c)(3). Both of these claims, intentional infliction of emotional distress and invasion of privacy, are factually distinct from the ADA claim, and arise entirely from the events of February 4, 2000, plaintiff's last day of work. The claim that Poznanski (and thus AAMC) invaded plaintiff's privacy by intruding upon his seclusion raises novel questions of state tort law that are better addressed by the Maryland

13. It is not clear whether plaintiff intends to suggest that his discharge in February 2001 was a retaliatory action. If he does, there is no evidence that it was causally connected to his protected activity, or that the discharge was a pretext for retaliation. Plaintiff was not discharged until February 5, 2001, which was more than two years after his request not to work overtime and a year after he had taken medical leave from AAMC. (See Phillip Dec. ¶ 3.) Further, AAMC has offered a legitimate, non-retaliatory reason for the discharge: it was made pursuant to a policy that limits employees to one year of medical leave. (See id. ¶¶ 2–3.)

courts.[14] Moreover, it would be an imprudent use of the limited resources of a federal court to decide a tort claim arising out of a discrete and singularly personal incident involving non-diverse parties— and arguably not meeting the threshold amount in controversy even if the parties were diverse—when no related federal claim remains pending. For these reasons, Counts II and III will be dismissed without prejudice.[15]

## ORDER

For the reasons stated in the accompanying memorandum, it is, this 5th day of August 2002

ORDERED that

1. Plaintiff's motion to strike Exhibit H to defendants' memorandum is granted.

2. Defendants' motion for summary judgment is granted as to Count I, which alleges a violation of the Americans with Disabilities Act.

3. Judgment is entered in favor of the defendant AAMC, against the plaintiff, as to Count I.

4. Counts II and III, alleging intentional infliction of emotional distress and invasion of privacy, are dismissed without prejudice.

14. If the intentional infliction claim were the only common law claim in plaintiff's suit, I would exercise jurisdiction to decide it. Maryland law is more settled as to intentional infliction, permitting recovery only in cases involving "the most extreme and unusual circumstances." *Hrehorovich v. Harbor Hosp. Ctr., Inc.,* 93 Md.App. 772, 614 A.2d 1021, 1034 (1992). However, since plaintiff's intentional infliction claim is closely related to his invasion of privacy claim, I will decline to exercise jurisdiction over both.

15. Although I am dismissing these claims, I will address a procedural motion by plaintiff that relates to one of the claims. Plaintiff has moved to strike defendants' Exhibit H, which includes a demand letter that plaintiff's counsel sent to defense counsel in preparation for settlement negotiations before a magistrate judge. Defendants contend that they submitted the exhibit, which details the type of relief plaintiff requests, in support of their argument that Maryland's Workers' Compensation

Act bars plaintiff's intentional infliction claim. While this exhibit may not technically constitute a pleading under Fed.R.Civ.P. 12(f), *see Thomas v. Bet Sound–Stage Rest./BrettCo, Inc.,* 61 F.Supp.2d 448, 458 (D.Md.1999), its submission to the court contravened both the spirit and letter of Local Rule 607(4). That rule states: "The Court's ADR process is confidential. Unless otherwise agreed by the parties and the Court no disclosure shall be made to anyone, *including the judicial officer to whom the case is assigned,* of any dispute resolution communication that in any respect reveals the dispute resolution positions of the parties ...." D. Md. R. 607(4) (emphasis added). Plaintiff's letter contained the amount for which plaintiff proposed to settle, and thus fell within the rule's parameters. While I do not decide whether a redacted version of the letter would have been acceptable, the fact that the letter was not redacted renders the entire exhibit objectionable. Therefore, plaintiff's motion to strike will be granted.