**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 05-1268**

LEE BELTON,

Plaintiff - Appellant,

versus

CITY OF CHARLOTTE,

Defendant - Appellee.

**No. 05-1450**

JEROME FREDERICK,

Plaintiff - Appellant,

versus

CITY OF CHARLOTTE,

Defendant - Appellee.

**No. 05-1459**

LARRY MACKEY,

Plaintiff - Appellant,

versus

CITY OF CHARLOTTE,

                                          Defendant - Appellee.

───────────────

Appeals from the United States District Court for the Western District of North Carolina, at Charlotte.  David C. Keesler, Magistrate Judge.  (CA-03-165-3; CA-03-179-3; CA-03-159)

───────────────

Argued:  February 2, 2006                Decided:  May 23, 2006

───────────────

Before MICHAEL, GREGORY, and SHEDD, Circuit Judges.

───────────────

Affirmed by unpublished per curiam opinion.  Judge Gregory wrote a separate opinion concurring in part and dissenting in part.

───────────────

Kerry Brindley Everett, Charlotte, North Carolina, for Appellants. Richard Harcourt Fulton, Assistant City Attorney, OFFICE OF THE CITY ATTORNEY, Charlotte, North Carolina, for Appellee.

───────────────

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

PER CURIAM:

Lee Belton, Jerome Frederick, and Larry Mackey ("plaintiffs") are each African-American Battalion Chiefs with the Charlotte Fire Department ("Fire Department" or "Department"). They have each worked for the Department for nearly thirty years and have solid employment records. They filed separate suits against the City of Charlotte for employment discrimination, alleging racially disparate treatment, racially hostile work environment, and retaliation for protected activity in violation of Title VII of the Civil Rights Act of 1964. 42 U.S.C. §§ 2000e et seq. The district court granted summary judgment to the City in each of these cases, and plaintiffs appeal. Because the cases have similar facts and identical legal issues, we dispose of the appeals in a single opinion. For the reasons that follow, we affirm.

I.

We present the facts in the light most favorable to plaintiffs, the non-movants. See Anderson v. Westinghouse Savannah River Co., 406 F.3d 248, 259 (4th Cir. 2005).

A.  The Charlotte Fire Department

The Charlotte Fire Department has 1,015 employees. As a paramilitary organization, the Department is strictly hierarchical. The highest ranking officer is the Fire Chief, the next-highest are

Deputy Chiefs, and the third-highest are Battalion Chiefs. There are four Deputy Chief positions, which become available only when a current Deputy Chief retires or otherwise leaves. Only Battalion Chiefs are eligible for promotion to Deputy Chief. The Fire Chief personally selects which Battalion Chief will be promoted to Deputy Chief, though the City Manager must formally approve the Chief's selection. (The City Manager's approval is routinely granted.) Luther Fincher, Jr., has served as Fire Chief since 1987. In his first seventeen years as Fire Chief, from 1987 to 2004, he never selected an African American to be Deputy Chief. He selected a white male in every instance.

Of the currently twenty-five Battalion Chiefs (twenty-four in 2001), five are African-American males and two are white females. Because there is no guarantee of or entitlement to promotion, many Battalion Chiefs will never be promoted to Deputy Chief. The annual base pay differential is roughly $17,000 or $18,000. Throughout his tenure as Fire Chief, Fincher has periodically changed the selection process for Deputy Chief, at times favoring a formal process and at other times simply handpicking an individual for promotion. Fincher contends that "each process [was] a little bit different" to accommodate the Fire Department's changing needs. B.J.A. 260.[*] As of 2001 Fincher

---

[*]B.J.A. refers to Belton Joint Appendix, F.J.A. to Frederick Joint Appendix, and M.J.A. to Mackey Joint Appendix.

instituted a formal selection process with publicized eligibility criteria and a written exercise.

It appears to be "common knowledge" within the Fire Department that Fincher "'ha[s] grown up on the other side of the tracks' and [does] not relate well to people of various races." F.J.A. 761. At some point prior to becoming Fire Chief (between 1974 and 1985), Fincher said that "if he were ever in a position of authority, he would make sure Blacks in the Fire Department knew their place and stayed in it." F.J.A. 764. Additionally, Fincher has used the epithet "nigger" at least two times since 1974, though never in front of Belton or Mackey. On one occasion between 1974 and 1985, he asked one white firefighter "why he hung out with 'niggers' so much." F.J.A. 764. In approximately 1989 he told Frederick that "[n]o one cares about those 'niggers' in Double Oaks [a neighborhood in Charlotte]" and that "you [Frederick] can call them 'niggers' but I can't." F.J.A. 86. In this same conversation he told Frederick to "go and cook [me] some grits." F.J.A. 97. In the late 1990s Fincher became irate upon learning that all three assessors on a Department panel considering his son's promotion were African American. By his reasoning, no panel should ever consist only of members of one race because "every point of view" will not be represented. B.J.A. 676.

B.  Plaintiffs

1.  Lee Belton

Belton first joined the Fire Department in 1977 as a Firefighter I.  While his Captain was "very helpful for a young black firefighter," his Battalion Chief at the time had a reputation for being racist and at times "cursed [Belton] out" and "embarrassed [him] in front of the guys," though he never used any racial slurs with Belton.  B.J.A. 55-56.  In Belton's first four years as a firefighter, a fellow firefighter in his battalion used the word "nigger" once in his presence in reference to another African-American male.  In 1981 Belton was promoted to Firefighter-Engineer, having scored well on the written exam for that position.  Approximately one year later he was promoted to Captain.  In his first few years as Captain, he felt isolated as the only African American in meetings and "didn't have any kind of relationship" with his direct boss, Battalion Chief Ken Flowe, who never addressed Belton in meetings but communicated regularly with the other Captains whom he supervised.  B.J.A. 61.  Belton was promoted to Battalion Chief in 1990.

No one has made any discriminatory remarks in front of Belton since he became Battalion Chief.  "Having rank" in the Department has been Belton's defense against being exposed to such remarks, B.J.A. 60:  "As a chief officer, nobody approaches me that way anymore because then they'd force me to do something about it,"

6

B.J.A. 117-18. Some lower-ranking firefighters from different battalions have complained to Belton about hearing discriminatory remarks. Each time, Belton has instructed the reporting firefighter to "bring it up the chain of command [within the reporting firefighter's own battalion] and . . . get it addressed and get something done about it." B.J.A. 118.

Belton has applied for promotion to Deputy Chief every time a position has opened up between 1996 and 2001, a total of five times (see part I.C below). Fincher has never selected Belton for this promotion, at times "leapfrogg[ing]" over him to select candidates with less experience. B.J.A. 99. Over the years Belton has repeatedly asked Fincher "why [he] was being skipped" for promotion, but Fincher never gave a direct answer. B.J.A. 91. In late 1999 or early 2000 Deputy Chief Hannan encouraged Belton to work on his writing skills, perhaps by attending a technical writing class. Deputy Chief Duffy likewise advised Belton to attend a technical writing class after receiving a report that Belton had written. Belton thereafter attended the class.

Throughout his career Belton has consistently earned ratings of "Expected" or their equivalent on his performance evaluations (the highest possible rating is "Exceptional" and the lowest is "Unacceptable"). He has an exceptional attendance record, has completed various training courses, and has chaired numerous special projects, including recruitment and events

7

planning for the Department and fund-raising campaigns for charities. He has one disciplinary action on his record, an "AWOL" (absent without leave) in 1998 when he missed work because of a family emergency and could not contact his supervisors to inform them of his absence.

## 2. Jerome Frederick

Frederick first joined the Fire Department in 1977 as Firefighter I. He was promoted to Firefighter-Engineer in 1980, having scored well on the written exam. After he was temporarily promoted to Captain in 1982, he detected some racial hostility from two white subordinates (firefighters who indicated they would not ride in his truck but who never actually refused). In 1983 Frederick was permanently promoted to Captain of a different station, where he experienced no racial discrimination. He was promoted to Battalion Chief in 1988. At some point thereafter, his supervisor, Deputy Chief Roger Weaver, drew an imaginary line across his desk and warned that "he was going to get [Frederick]" if Frederick "cross[ed] that line," a statement that Frederick did not understand. F.J.A. 101. In 1998 Frederick was told secondhand that a lower-ranking firefighter in a different battalion had made a racist remark, though Frederick did not know if this report was "truth or hearsay." F.J.A. 87. In 2004, after white firefighters in his command reported that an African-American firefighter was not being "treat[ed] right" by other white firefighters, Frederick

8

expedited that firefighter's transfer (which that firefighter had previously requested).  F.J.A. 106.

Like Belton, Frederick has sought promotion to Deputy Chief all five times in question (see part I.C below).  Fincher has never selected Frederick for this promotion.  Frederick asked Fincher at one point between 1996 and 2000 how to improve his chances of promotion, to which Fincher replied, "If you don't know, I don't know."  F.J.A. 713.  In a 2002 evaluation Deputy Chief Dulin recommended that Frederick attend a technical writing class. In 2003 Fincher once ignored Frederick's greeting and told Frederick that he (Fincher) "made [Frederick's] hair turn gray," a comment that Frederick found incomprehensible but offensive. F.J.A. 98.

Throughout his career Frederick has consistently earned ratings of "Expected" or the equivalent on his performance evaluations, though his ratings have at times verged toward "Above Expected" (and he in fact earned one "Above Expected").  Like Belton, Frederick has an excellent attendance record, has completed various training courses, and has participated in special projects. He has no disciplinary record.

3.  Larry Mackey

Mackey joined the Fire Department in 1977 as Firefighter I.  Roughly two years later he was promoted to Firefighter-Engineer.  Although Mackey has never directly heard a racial slur

9

during his career, he believes that certain incidents and Department decisions bear the mark of racism. For example, when he served as Firefighter-Engineer, his supervisor did not allow him to drive the fire truck, and Mackey believes this slight was for racial reasons. When he was subsequently transferred to another station, his new supervisor wrote him up as "AWOL" for missing some work because of an injured thumb, which Mackey believes his supervisor would not have done were Mackey white. After competing at least twice for the rank of Captain (taking a written exam and interviewing), Mackey and two other firefighters filed a charge with the Equal Employment Opportunity Commission ("EEOC"). Mackey subsequently withdrew his complaint and in January 1983 was promoted to Captain. In the first few months after being promoted, he was reprimanded for inappropriate conduct (using profanity to order a medic truck driver to move her vehicle), an incident that Mackey believes would have been overlooked were he white.

Mackey competed for rank of Battalion Chief approximately nine times. The first three or four times that he was eligible for promotion, then-Battalion Chief James Burke wrote him up for some incident (such as "insubordination" for leaving work because of illness and "conduct unbecoming" for allegedly threatening a fellow firefighter over the phone), thereby rendering Mackey ineligible for promotion. Mackey transferred to a different battalion in 1992 or 1993. In 1996 Mackey filed a charge of discrimination with the

10

EEOC, alleging that the Fire Department's use of in-house assessors in the Battalion Chief promotion process was discriminatory. In exchange for Mackey dropping his charge, the Fire Department replaced the in-house assessors with outside assessors -- a change that Mackey believed "vindicated . . . [his] stance." M.J.A. 204. In 1998 Mackey was promoted to Battalion Chief in an independently scored process.

Unlike Belton and Frederick, Mackey has not competed for the rank of Deputy Chief every time in question between 1996 and 2001 (see part I.C below). He was not yet a Battalion Chief the first time (in 1996 or 1997), he did not apply the second time, and the fifth time he was ineligible because he had only three years' experience as Battalion Chief. Mackey nonetheless contends that all four times that he was Battalion Chief he should have had the "opportunity to put [his] cards on the table and display [his] abilities just like everybody else." M.J.A. 219.

Throughout his career Mackey has steadily earned ratings of "Expected" or their equivalent on his performance evaluations. He has completed a high-level fire service management course and has earned some specialized certifications. He has a disciplinary record for charges of conduct.

C.   Failures to Promote

In late 1996 or early 1997 roughly ten or eleven Battalion Chiefs applied for promotion to Deputy Chief, including Battalion Chiefs Belton and Frederick.  The competition consisted of oral interviews with Chief Fincher and the then-Deputy Chiefs, who asked the candidates scenario questions.  Fincher ultimately selected Battalion Chief David Duffy, a white male, for promotion.  Duffy later told Frederick that he had not intended to apply but "they" told him to do so.  F.J.A. 712.  Two Deputy Chiefs later informed Belton that he and Duffy had been the top two candidates.  Duffy, however, enjoyed a distinct advantage over Belton and the remaining field:  prior to the competition, Duffy had been chosen to serve as Acting Deputy Chief under retiring Deputy Chief Roger Weaver, who acted as Duffy's mentor.  Belton, Frederick, and the other candidates had never been offered this opportunity.  Belton thereafter asked Fincher how he could improve his chances of promotion but received no direct answer.  Neither Belton nor Frederick filed a complaint with the EEOC.

For the next three Deputy Chief openings, Fincher bypassed the formal selection process and instead simply handpicked a Battalion Chief for promotion.  See, e.g., B.J.A. 286 (Fincher said, "I've been working with these guys for years in the positions. . . .  I knew what their potential was.").  The Battalion Chiefs did not object to this change at an annual meeting

12

before the first of these three openings in 1998; some Battalion Chiefs had even urged the change because they "felt that it was a waste of time to have a process [when it was clear to them that Fincher] had already made up his mind before the process would even begin." B.J.A. 87. In 1998 Fincher selected Battalion Chief Fred Rich, a white male, for promotion over the other interested candidates, including Belton and Frederick. Neither Belton, Frederick, nor Mackey filed a charge with the EEOC at the time.

In early 1999 Fincher selected Battalion Chief Jon Hannan, a white male, for promotion, even though Hannan had only three years of experience as Battalion Chief. Under the previous formal process, only Battalion Chiefs with at least four years of experience were considered eligible. Hannan admitted to being surprised at his promotion given his relative inexperience as Battalion Chief. Nonetheless, the then-Deputy Chiefs had unanimously recommended Hannan for promotion over the other interested candidates (including Belton and Frederick), and Fincher judged Hannan to be the "best candidate" in the field because he had no disciplinary record and, according to Fincher, his performance "always exceeded expectations" and was sometimes "exceptional." F.J.A. 460. After Hannan's promotion neither Belton, Frederick, nor Mackey filed a charge with the EEOC.

In late 1999 Fincher selected Battalion Chief Jim Burke, a white male, to fill the newly available Deputy Chief position.

13

Burke had competed for the position four or five times previously. He had over four years of experience as Battalion Chief and had led a very active battalion. Again, plaintiffs did not file a charge with the EEOC.

At some point in 2001, prior to the final promotion in question, the five African-American Battalion Chiefs (including plaintiffs) met with Fincher to discuss his promotional process and the need for diversity within the Department. Fincher addressed their concerns by "allow[ing] an outside contractor to come in, do a diversity training session for the Battalion Chiefs, and that was it." M.J.A. 260.

For the 2001 opening Fincher reinstituted the formal selection process because he had received a complaint about his informal process from Battalion Chief Willie Summers (also African American). The formal process consisted of a written test, possibly an interview, and a review of the candidates' records. At some point before the written test, Fincher's assistant mailed out an official announcement of the eligibility criteria: (1) at least four years' experience as Battalion Chief; (2) at least an "Expected" rating in the prior two performance appraisals; (3) a two-year degree (after high school); and (4) no disciplinary record in the prior two years. There is some uncertainty about when or if all the interested candidates received full notice of the formal process. Belton contends that he received notice later than the

14

other candidates and Frederick contends that his notice was inadequate, suggesting that both men had less time or no time to prepare for the test. The exact dates and contents of the notice, however, are unclear. Then-Battalion Chief Jeff Dulin received an announcement either by letter or email some time before the competition day, informing him that the competition would consist of a written test and an oral interview with Fincher. Frederick received the announcement by email, but understood from it that he was to attend an informational meeting on the morning specified -- not that he would engage in the actual competition. Frederick called Fincher's secretary to ask what sort of meeting had been planned, but she could not or would not specify. Belton received no written notice but only a voice mail message while he was in Georgia attending a work-related seminar. The message instructed him to report to the General Office on the day specified, but did not specifically alert him that there would be a written exam. He promptly left the seminar to return home.

On the morning in question the five interested and eligible candidates (including Belton and Frederick) arrived at the General Office. The candidates had three hours to provide written answers to twelve questions. Because there were only four available laptops but five candidates, Fincher directed Battalion Chief Dulin to take the exam on a desktop computer in a nearby office that Dulin had been using as his temporary office. The

15

remaining candidates took the test together in a conference room on laptops. These laptops were old and finicky machines that frequently malfunctioned. Computer technicians at times interrupted the testing process to make repairs. Nonetheless, Belton, Frederick, and the other two candidates were able to complete the exam in the allotted time.

Fincher evaluated each of the candidates in his "Deputy Chiefs Process Score Sheet[] 2001." He scored the three white candidates higher than the two African-American candidates, Belton and Frederick. He graded Belton's leadership as "average," his written communication skills as "lacking," his oral communication skills as "average," and his written exercise as "below average." He further noted that Belton had received a "G" rating ("good performance which meets and periodically exceeds requirements") in the prior two appraisal evaluations. B.J.A. 746. Similarly, Fincher graded Frederick's leadership as "average," his communication skills as "[n]ot very good," and his written exercise as "less than average." B.J.A. 750. Fincher noted that Frederick had also received a "G" rating in the prior two performance appraisals. By contrast, Fincher graded Dulin as "excellent" in all categories (leadership skills, communication skills, and written exercise), and noted that Dulin had received an "E" rating ("consistently far exceeds requirements") in the prior two

16

appraisals.  B.J.A. 714.  Dulin had fewer years experience on the force than either Belton, Frederick, or Mackey.

Fincher later testified that, when evaluating the eligible candidates, he favored "competency and skills" over "seniority and experience," particularly because Deputy Chiefs interact with the City Manager, make presentations to the budget director and city council, and help craft city policy.  B.J.A. 259. Further, he testified that he considered an applicant's complete disciplinary record even though only recent disciplinary action disqualified a candidate.  Fincher also considered each candidate's list of special projects, such as involvement with emergency response teams and charitable campaigns.  Fincher, however, "handpicks who he wants to do the special projects" and thereby "groom[s]" candidates for promotion.  F.J.A. 1091.  Indeed, in 2000 Fincher ignored Belton's request to lead a special recruitment project, and on another occasion similarly "blew . . . off" Mackey's request to lead a special project involving emergency medical services.  M.J.A. 225.  (Belton and Frederick have performed a number of other special projects over the years, though.)

The Fire Department formally announced Dulin's promotion on December 26, 2001, roughly two months after the competition day. Belton testified that, upon learning of Dulin's promotion, he immediately felt that Dulin had been promoted for "racial reasons"

17

and that "the precedent had been set that the Chief was not going to promote a black man." B.J.A. 98. Sometime in January 2002 Belton asked Fincher why "was a younger, less experienced chief being leapfrogged over [Belton] again into the position when [Belton] had basically been in this position [roughly] fifteen years." B.J.A. 99. Fincher gave a vague answer and then elaborated with seeming contradictions. Fincher said that Belton wrote less on the test than Dulin but there was "absolutely nothing" that Belton could have written that would have changed Fincher's mind. B.J.A. 109. Frederick also questioned Fincher about not being promoted. Fincher responded that Frederick "wasn't the type of candidate [that the Fire Department was] looking for for that position because he had the inability to write and deliver a message." B.J.A. 302.


## D. Events after 2001

In September 2002 Belton, Frederick, Mackey, and Summers met with David Sanders in the City's human resources department. They complained that Fincher excluded them from the promotion process, that the process kept changing, and that they had no idea what the qualifications were. In a subsequent meeting Sanders indicated that he would investigate their claims. On November 4, 2002, Belton and Frederick filed a charge of discrimination with the EEOC, alleging in part a "failure to promote, discriminatory

18

remarks, and disparate treatment." B.J.A. 36. Mackey filed a similar charge with the EEOC on November 7.

In December 2003 the Fire Department instituted a requirement that candidates for Deputy Chief have a four-year degree instead of a two-year degree, effective January 2005. As of 2004 Belton was pursuing a four-year degree and expected to earn it by the end of that year (though he did not meet that goal); Frederick was not enrolled in a program but indicated his intention to do so; and Mackey had already earned his four-year degree. On March 18, 2004, Belton and Frederick each filed a second charge of discrimination with the EEOC, alleging retaliation through the adoption of the four-year-degree requirement.

The City's investigation lasted ten months, from September 2002 through June 2003. The City never once advised Belton, Frederick, or Mackey on the progress or results of the investigation. Ultimately, Sanders found no evidence that Fincher promoted based on race but concluded that Fincher's selection process could be perceived as racially discriminatory. In his deposition testimony Sanders conceded that Fincher controlled the selection process and could, if he wished, change the criteria to "make sure" that an individual whom he favored (presumably a white individual) was promoted over other interested candidates (including African Americans). F.J.A. 386. At the close of the investigation, Sanders recommended to the City's human resources

director that Fincher receive counseling on the potential perception of racial bias, though Sanders does not know if Fincher ever received such counseling. The human resources director thereafter met with Fincher, presumably to relay the results of the investigation.

### E. Retaliation

As noted above, Belton challenges the newly instituted four-year-degree requirement. The requirement, in his view, is retaliation against him for filing charges with the EEOC and for giving deposition testimony in 2001 in a discrimination case brought by an African-American female firefighter against the City of Charlotte. See Johnson v. City of Charlotte, 229 F. Supp. 2d 488 (W.D.N.C. 2002). Frederick similarly alleges that the Department's four-year-degree requirement is retaliation against him for filing charges.

Mackey, for his part, alleges another sort of retaliation: he has been subject to "far more scrutiny" within the Department since filing charges. M.J.A. 229. For example, Battalion Chief Rich Granger has questioned and denied some of Mackey's requests for equipment, which he (Mackey) believes would not have occurred had he not sued the Fire Department. At some point in 2003 Mackey asked Fincher if Fincher would write him a letter of recommendation, and Fincher replied that it would be

20

difficult to do that while being sued by Mackey. Fincher never wrote the letter, having viewed Mackey's request as a purely hypothetical inquiry. Mackey does not dispute this characterization. In addition, Deputy Chief Dulin requested that Mackey submit further documentation to support two of his personnel evaluations (two "Exceptional" ratings that Mackey gave an African-American male and a white female). Dulin has made similar requests of other Battalion Chiefs and ultimately approved Mackey's ratings without receiving the supplemental materials.

## F.

Belton, Frederick, and Mackey each filed a complaint against the City of Charlotte in the U.S. District Court for the Western District of North Carolina in April 2003, alleging Title VII violations. Plaintiffs asserted claims for racially disparate treatment, racially hostile work environment, and retaliation for protected activity. The parties consented to have these cases determined by the magistrate judge, see 28 U.S.C. § 636(c), and we therefore refer to the magistrate judge as the "district court." The district court granted summary judgment to the City on all claims in all three cases, in Belton's in February 2005 and in Frederick's and Mackey's in March 2005. Plaintiffs timely appeal.

21

## II. Disparate Treatment Claims

### A. Failure to Promote

The plaintiffs each allege disparate treatment based on a failure to promote. Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-3(a). The district court granted summary judgment to the City of Charlotte on all three failure-to-promote claims upon finding each claim time-barred. We review the grant of summary judgment de novo, viewing the facts in the light most favorable to plaintiffs, the non-moving parties. Spriggs v. Diamond Auto Glass, 242 F.3d 179, 183 (4th Cir. 2001). A moving party is entitled to summary judgment if the evidence shows that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). We affirm the grant of summary judgment to the City on plaintiffs' failure to promote claims because they are barred by the applicable statute of limitations.

Title VII requires an aggrieved party to file a complaint with the EEOC "within one hundred and eighty days after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1). As the Supreme Court has noted, the limitations period "'inevitably reflects a value judgment concerning the point at which the

22

interests in favor of protecting valid claims are outweighed by the interests in prohibiting the prosecution of stale ones.'" Delaware State Coll. v. Ricks, 449 U.S. 250, 260 (1980) (citing Johnson v. Ry. Express Agency, Inc., 421 U.S. 454, 463-34 (1975)). A potential side effect of this short limitations period is that it "might tend to deter efforts at conciliation" by accelerating the filing of lawsuits. Johnson, 421 U.S. at 461. Congress, however, has deliberately chosen this 180-day period, and "courts may not second-guess that decision." Lever v. Northwestern Univ., 979 F.2d 552, 554 (7th Cir. 1992).

The district court determined that plaintiffs' five alleged failures to promote were all discrete acts, the last of which occurred either on December 26, 2001 (when the Department announced Dulin's promotion) or on January 2, 2002 (when Dulin assumed the position). Plaintiffs filed their charges with the EEOC roughly nine months later, well over the six-month (180-day) period: Belton and Frederick filed theirs on November 4, 2002, and Mackey filed his on November 7. The court concluded that "there is no legally cognizable argument that [plaintiffs] filed the [c]harge within the required time period." B.J.A. 1344, F.J.A. 1604, M.J.A. 1318. We agree with the district court's conclusion.

The Supreme Court has specifically identified the failure to promote as a "discrete act" that "occur[s] on the day that it happen[s]." National R.R. Passenger Corp. v. Morgan, 536 U.S. 101,

23

110-14 (2002). Each discrete act of discrimination "starts a new clock for filing charges alleging that act," meaning that only incidents that occur within the timely filing period are actionable; prior acts can only be used as background evidence in support of an otherwise timely claim. Id. at 113-14; see also Williams v. Giant Food Inc., 370 F.3d 423, 428 (4th Cir. 2004). Here, because all of the challenged acts occurred outside of the period for timely filing, the entire claim is time-barred.

Plaintiffs attempt to breathe new life into their failure-to-promote claims by alleging that the discrete acts constitute a continuing violation that ends within the limitation period. "Because failure to promote is a discrete act" under Morgan, however, "the continuing violation doctrine does not apply . . . and cannot save [plaintiffs'] untimely claims." Williams, 370 F.3d at 429 (citing Morgan, 536 U.S. at 114). Plaintiffs further allege that the discrete acts reflect a seventeen-year pattern or practice of discrimination coinciding with Fincher's tenure as Chief. This allegation, however, cannot extend the applicable time period when the challenged acts are each individually time-barred. Cf. Davidson v. Am. Online, 337 F.3d 1179, 1186 n.3 (10th Cir. 2003) (noting that Morgan left unanswered how courts should proceed on pattern-or-practice claims based on a series of discriminatory acts but only if some acts occurred within timely filing period). In Williams we held that each failure to

24

promote remains a discrete act of discrimination even if it is part of a broader discriminatory practice.  <u>Williams</u>, 370 F.3d at 429. This reasoning is consistent with <u>Bazemore v. Friday</u>, 478 U.S. 385 (1986), and with the opinions of other courts.  <u>See, e.g.</u>, <u>Elmenayer v. ABF Air Freight Sys., Inc.</u>, 318 F.3d 130, 134 (2d Cir. 2003) ("The clear message of <u>Bazemore</u> is that an employer performs a separate employment practice each time it takes adverse action against an employee, even if that action is simply a periodic implementation of an adverse decision previously made."); <u>Davidson</u>, 337 F.3d at 1185-86; <u>Cherosky v. Henderson</u>, 330 F.3d 1243, 1248 (9th Cir. 2003).  Even if, as plaintiffs contend, each failure to promote simply reactivated a decision that Fincher made long ago never to promote an African American to Deputy Chief, each failure remains a discrete act.  Because each such act occurred outside of the applicable limitations period, each plaintiff's entire claim is time-barred.

Plaintiffs also assert that they are entitled to equitable relief in the event that this court deems their filings untimely.  We conclude, however, that neither equitable tolling nor equitable estoppel is applicable here.  Equitable tolling is a "narrow limitations exception" that is to be used sparingly.  <u>Olson v. Mobil Oil Corp.</u>, 904 F.2d 198, 201 (4th Cir. 1990) (<u>en banc</u>); <u>see also</u> <u>Morgan</u>, 536 U.S. at 113.  It applies only when the employer "'wrongfully deceived or misled the plaintiff in order to

25

conceal the existence of the cause of action.'" Olson, 904 F.2d at 201 (quoting English v. Pabst Brewing Co., 828 F.2d 1047, 1049 (4th Cir. 1987)). The employee's failure to timely file must "result[] from either a 'deliberate design by the employer or actions that the employer should unmistakably have understood would cause the employee to delay.'" Id. (quoting Price v. Litton Bus. Sys., Inc., 694 F.2d 963, 965 (4th Cir. 1982)). There is no evidence of such motive or action on the part of the employer here. Although the promotion process was informal at times, it was not secretive. Plaintiffs knew in advance of each position opening. Cf. Van Slyke v. Northrop Grumman Corp., 115 F. Supp. 2d 587, 593 (D. Md. 2000). By the fifth time that plaintiffs were passed up for promotion (or by the fourth time in Mackey's case), they were aware of virtually all the evidence on which they now rely. See Olson, 904 F.2d at 201-02. Indeed, Belton testified that when the Department announced Dulin's promotion on December 26, 2001, he immediately felt that Dulin had been promoted "for racial reasons" and that "the precedent had been set that the Chief was not going to promote a black man." B.J.A. 98. Because there is no evidence that the City actively concealed the existence of the cause of action, equitable tolling is inapplicable.

Equitable estoppel is equally inapplicable. Equitable estoppel applies only when the employer takes active steps to prevent the plaintiff from filing his case, for example by

promising not to plead the statute of limitations. See English, 828 F.2d at 1049. Here, the City did not affirmatively prevent the plaintiffs from suing. The City's promise to investigate does not by itself qualify as deliberate deception. Moreover, simply failing to update the plaintiffs on the progress of the investigation does not qualify as affirmative misconduct. The plaintiffs might have delayed their filing out of a desire to pursue the least divisive and disruptive path, specifically an internal review process that would not air "the Fire Department's dirty laundry . . . in public." M.J.A. 236. But plaintiffs' hope that the internal process would remedy the problem is not the type of situation that equitable estoppel is designed to address. See Ricks, 449 U.S. at 261 ("[P]endency of a grievance or some other method of collateral review of an employment decision[] does not toll the running of the limitations period."); Lucas v. Chicago Transit Auth., 367 F.3d 714, 721-22 (7th Cir. 2004) (holding that employer's internal review is not by itself "an active step" that warrants application of equitable estoppel); Lever, 979 F.2d at 556 ("[An employer's] many and varied opportunities for internal review is not the sort of deception that supports equitable estoppel.").

Finally, plaintiffs try to cast their claims as timely by identifying the City's failure to update them on the investigation as the "final violation" in the chain of failures to promote. See, e.g., Belton's Reply Br. at 2. Although plaintiffs do not

27

elaborate on this theory, they presumably mean that the City's failure to promote them in December 2001 was not final until the close of the City's investigation in June 2003 (roughly seven months after plaintiffs filed their charges with the EEOC). The City's December 2001 decision to promote Dulin over plaintiffs was not, however, a provisional recommendation. It was a final decision. That the City later considered a complaint about the promotion process does not transform the earlier decision into a tentative one, as the Supreme Court explained in Ricks. "The [employer's] grievance procedure, by its nature, is a remedy for a prior decision, not an opportunity to influence that decision before it is made." Ricks, 449 U.S. at 261. For this reason, the existence of a grievance procedure "should not obscure the principle that limitations periods normally commence when the employer's decision is made." Id. To hold otherwise would allow employees unilaterally to extend the 180-day limit by filing a series of complaints or internal appeals. See Lever, 979 F.2d at 556 (citing Ricks). Accordingly, the city's eventual refusal to undo the promotion decision is not a "fresh act of discrimination" that restarts the clock. Id.

B. Denial of Equal Opportunities

Belton and Mackey also allege disparate treatment based on a general failure to provide equal opportunities. To establish

28

a prima facie case, plaintiffs must show that they are members of a protected class, they applied for the positions in question, they were qualified for the positions, and they were "rejected for the position[s] under circumstances giving rise to an inference of unlawful discrimination." McNairn v. Sullivan, 929 F.2d 974, 977 (4th Cir. 1991). The district court determined that neither Belton nor Mackey specifically identified the opportunities allegedly denied them. After combing the record, the district court identified certain opportunities that could be the subject of Belton's and Mackey's complaints.

Belton, for his part, presumably challenges: (i) the Department's failure to assign him unspecified special projects; (ii) the Department's failure to select him to attend a training session in Washington, D.C., in 2001; and (iii) Fincher's failure to grant his request to lead recruiting efforts in 2000. The district court determined that Belton fails to establish a prima facie case of discrimination on the first allegation because he does not provide sufficient evidence that he was qualified for unspecified special projects and that other white employees in similar circumstances were given such opportunities. Indeed, Belton has participated in a number of special projects throughout his career, including work on the citywide Workforce Committee and on fund-raising campaigns for the United Way and the Arts and Sciences Council. Even if Fincher selectively assigns special

29

projects to favored employees and thereby grooms them for promotion, favoritism alone does not prove racial discrimination. See Blue v. United States Dep't of the Army, 914 F.2d 525, 541 (4th Cir. 1990) ("If one employee was unfairly preselected for the job, the preselection would work to the detriment of all applicants for the job, black and white alike."); see also F.J.A. 94 (Fincher selected a close friend's son to lead safety committee). Regarding the remaining two allegations (the 2001 training session and the 2000 recruitment project), the district court deemed them time-barred because they occurred well over 180 days prior to Belton's EEOC filing on November 4, 2002 (meaning that they occurred before May 7, 2002).

The district court gleaned from the record the following opportunities that Mackey presumably challenges: (i) the Department's failure to assign Mackey unidentified special projects; (ii) its failure to allow him to attend a certain fire training school; and (iii) Fincher's failure to grant Mackey's request to lead an emergency medical services project. Regarding the first allegation, the district court reached the same conclusion as it had earlier when analyzing Belton's parallel claim: that Mackey fails to establish a prima facie case of discrimination because he fails to make an adequate showing that he was qualified for these unspecified special projects and that a similarly situated white employee received such opportunities. The

30

district court deemed the remaining two allegations time-barred, stating that "it is clear from [Mackey's] testimony that both events occurred prior to May 11, 2002," 180 days prior to his filing the EEOC charge. M.J.A. 1321.

After reviewing de novo, we affirm, on the district court's reasoning, the grant of summary judgment to the City on Belton's and Mackey's claims of failure to provide equal opportunities.

From the parties' filings and briefs, it appears that Frederick also alleges disparate treatment based on a general denial of equal opportunities, although the district court did not expressly address this claim. The record indicates only two opportunities that Frederick identifies with any specificity: at some unspecified point after 1988 a Deputy Chief quashed Frederick's attempt to launch a special project teaching Spanish to firefighters because the Department "[didn't] want to do it," F.J.A. 91; and in approximately 1999 Fincher denied Frederick's request to attend an administration seminar in Las Vegas, Nevada, possibly because of budgetary concerns. This latter allegation is time-barred, since it occurred more than 180 days prior to November 4, 2001 (when Frederick filed his first charge with the EEOC). The former allegation, as with Belton's and Mackey's allegations, fails for insufficient evidence. Frederick cannot establish that other white employees were granted similar opportunities in similar

31

circumstances.  The Department's mere failure to support a Spanish-language program cannot, without more, give rise to an inference of unlawful discrimination.  Moreover, Frederick has participated in several other special projects throughout his career.

III.  Hostile Work Environment Claims

Plaintiffs each allege that they have suffered a racially hostile work environment in violation of Title VII.  42 U.S.C. § 2000e-2(a)(1).  Title VII prohibits racial discrimination that "has created a hostile or abusive work environment." Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 66 (1984).  To establish a prima facie case, a plaintiff must show that (1) the harassment was unwelcome, (2) based on race, (3) sufficiently severe or pervasive to alter the conditions of employment and create an abusive environment, and (4) there exists some basis for imposing liability on the employer.  Spriggs, 242 F.3d at 183-84.  Whether an environment is hostile or abusive depends on factors such as: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993).  The environment must be both subjectively and objectively offensive to be actionable under Title VII.  Id. at 22.

In granting summary judgment to the City on the hostile work environment claims, the district court concluded that each plaintiff fails to proffer evidence of discriminatory conduct that is sufficiently severe or pervasive to sustain such a claim. Reviewing de novo, we affirm on this ground.

Belton's hostile environment claim hinges on six main allegations that span his nearly thirty-year career: (i) a fellow firefighter used the word "nigger" sometime between 1977 and 1981; (ii) Belton felt isolated as the only African-American Captain in meetings; (iii) Battalion Chief Flowe did not communicate with him when he was Captain (between 1981 and 1990); (iv) Fincher has become angry during meetings and used profanity to address Belton and a white firefighter; (v) other firefighters have reported to Belton since he became Battalion Chief about hearing discriminatory remarks within their own battalions; and (vi) Belton has not been promoted to Deputy Chief. As the district court indicated, these incidents were all temporally remote from each other. Some cannot be characterized as based on race (notably (iv)), and some of the racially hostile remarks were not said in Belton's presence ((v) is hearsay). The most egregious and unambiguously race-based incident is (I), when Belton's fellow firefighter said "nigger" over twenty years ago in his presence. The firefighter's use of the racial slur "nigger" was reprehensible and inexcusable. But it was isolated and is remote in time. The single incident did not

33

permeate Belton's work environment with discriminatory insult and abuse and for this reason did not amount to "discriminatory changes in the terms and conditions of employment." Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (internal quotation marks and citation omitted). It is therefore insufficient to satisfy the "severe or pervasive" element of Belton's claim. See id. at 788 (1998) (noting that isolated incidents of abusive language will generally not meet requisite threshold of severity or pervasiveness) (citing Oncale v. Sundowner Offshore Servs., 523 U.S. 75, 80-82 (1998)). Indeed, Belton testified that he loves his job, respects his colleagues, and has even steered his son toward a career in the Department.

Frederick's hostile environment claim hinges on five main allegations, also covering his nearly thirty-year career: (I) in approximately 1989 Fincher used the word "nigger" when describing a neighborhood to Frederick and told Frederick to "go and cook [me] some grits," F.J.A. 97; (ii) at some point since 1988, Deputy Chief Weaver drew an imaginary line across his desk and warned Frederick that "he was going to get [Frederick]" if Frederick "cross[ed] that line," F.J.A. 101; (iii) in 1998 he was told secondhand that a lower-ranking firefighter in a different battalion made a racist remark, though Frederick did not know if this report was "truth or hearsay," F.J.A. 87; (iv) Fincher has raised his voice when speaking with Frederick on at least two occasions; and (v)

34

Frederick has not been promoted to Deputy Chief. Frederick also alleges that in 2003, subsequent to his filing charges, Fincher once ignored Frederick's greeting and told Frederick that he (Fincher) made Frederick's hair turn gray. While all of these incidents were unwelcome, several cannot be characterized as based on race. The glaring exception is (I). Fincher's use of the racial slur "nigger" to describe a Charlotte neighborhood was repugnant and inexcusable. "Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates." Spriggs, 242 F.3d at 185 (internal quotation marks and citation omitted). The slur is made even more offensive by Fincher's subsequent comment, "[G]o and cook [me] some grits." F.J.A. 97. As odious as these comments were, however, they were isolated and are now remote in time. They occurred during one exchange with Fincher in 1989, fourteen years before Frederick filed his lawsuit. As such, they cannot sustain Frederick's hostile environment claim. See Diggs v. Town of Manchester, 303 F. Supp. 2d 163, 180-82 & n.11 (D. Conn. 2004) (holding that racially derogatory remarks made in the early 1980s, more than fifteen years prior to plaintiff's filing suit, were "too remote to support an actionable hostile work environment claim" and that remaining incidents were "too isolated and sporadic to have created a subjectively and objectively hostile

35

work environment"); see also Spriggs, 242 F.3d at 185 (holding that supervisor's constant, even daily, use of racial epithets such as "nigger" and "monkey" was sufficiently severe or pervasive to survive summary judgment).

Mackey's hostile environment claim consists of five main allegations occurring since the late 1970s: (i) when he was first promoted to Firefighter-Engineer, his boss did not allow him to drive; (ii) also while he was Firefighter-Engineer, another boss wrote him up as "AWOL" for missing work because of a thumb injury; (iii) he was twice reprimanded for allegedly inappropriate conduct; (iv) a superior questioned the quality of Mackey's instruction while Mackey taught at the Fire Academy; and (v) Mackey has not been promoted to Deputy Chief. Mackey has never, however, heard a racially discriminatory remark "to his face" during his career at the Department. M.J.A. 213-24. Again, these events are temporally remote from each other and some cannot be fairly characterized as based on race. While unwelcome and in some cases offensive, the challenged conduct is insufficiently severe or pervasive to create a racially abusive work environment as a matter of law. See Faragher, 524 U.S. at 788.


IV. Retaliation Claims

Title VII prohibits discrimination by an employer against any individual because that individual has "opposed any practice

made . . . unlawful" under Title VII or has "participated in any manner in an investigation, proceeding, or hearing under" Title VII. 42 U.S.C. § 2000e-3(a). To establish a prima facie case of retaliation under Title VII, a plaintiff must show that he engaged in protected activity, that an adverse employment action was taken against him, and that there was a causal connection between the two. Karpel v. Inova Health Sys. Servs., 134 F.3d 1222, 1228 (4th Cir. 1998). As an initial matter, it is clear that plaintiffs have engaged in protected activity, namely filing their charges with the EEOC. Belton also identifies one additional protected activity, his giving deposition testimony in 2001 in a Title VII case brought by an African-American female firefighter against the City of Charlotte (Johnson). None of the plaintiffs, however, can identify an adverse employment action sufficient to sustain their retaliation claim.

The retaliation that Belton and Frederick allegedly suffered is the Department's adoption of the four-year-degree requirement in December 2003, effective January 2005. This requirement, they argue, has "effectively eliminate[d] [them] from the promotion process." B.J.A. 944, F.J.A. 772. In 2003 Belton was enrolled in a four-year program and close to earning his degree (though he did not meet that goal). Frederick was not enrolled in a program but in his deposition testimony indicated his intent to do so. Because both men may earn their four-year degrees by the

37

time the next Deputy Chief position becomes available, the requirement cannot fairly qualify as adverse employment action taken against them, as the district court concluded.

Having already earned his four-year degree in May 2003, Mackey cannot show that the new requirement constitutes retaliation for filing charges. He identifies other sources of retaliation: Battalion Chief Granger's close scrutiny of his equipment requests; Fincher's failure to write him a letter of recommendation, which the district court deemed a purely hypothetical request (a characterization that Mackey does not dispute); and Deputy Chief Dulin's request that Mackey supplement some of his performance evaluations, though Dulin has made similar requests of other Battalion Chiefs and ultimately approved Mackey's evaluations without receiving the supplemental materials. As the district court determined, Mackey cannot show that these incidents constitute adverse employment actions that are causally connected to his filing charges. While they were no doubt vexing and interfered with Mackey's comfort level at work, these incidents cannot sustain a Title VII retaliation claim.

In addition to challenging these specified incidents, plaintiffs raised the "vague argument" in district court that they were retaliated against by the City's failure to update them on the progress of the internal investigation. B.J.A. 1354 n.19. The district court dismissed this claim on the ground that the mere

38

failure to update does not constitute adverse employment action. Because plaintiffs do not assert failure to update as part of their retaliation claim on appeal, we do not consider the allegation in this context. See United States v. Al-Hamdi, 356 F.3d 564, 571 n.8 (4th Cir. 2004) ("It is a well settled rule that contentions not raised in the argument section of the opening brief are abandoned."). Moreover, for this reason, we do not address whether the district court should have construed plaintiffs' failure to update claim more broadly to include the failure to investigate.

We thus affirm the district court's grant of summary judgment to the City on each plaintiff's retaliation claim.

V.

In sum, plaintiffs' claims of disparate treatment premised on a failure-to-promote are time-barred. On all remaining claims, plaintiffs fail to establish a prima facie case of discrimination. We therefore affirm the district court's grant of summary judgment to the City of Charlotte in each of the three cases.

No. 05-1268 AFFIRMED
No. 05-1450 AFFIRMED
No. 05-1459 AFFIRMED

39

GREGORY, Circuit Judge, concurring in part and dissenting in part:

The district court dismissed the Plaintiffs' claim that the City's mishandling of their complaints was an act of retaliation, concluding that "the failure to 'update' [the Plaintiffs of the progress of the City's investigation] [did] not constitute an adverse employment action."  Id. at 1354.  In so holding, the district court construed the Plaintiffs' contentions too narrowly. The Title VII violation alleged before the district court, and preserved on appeal, is not a simple failure to inform, but rather a more pernicious failure to investigate.  See B.J.A. 802; Br. of Appellant [Belton] at 29; Br. of Appellant [Frederick] at 30-31; Br. of Appellant [Mackey] at 23.  Because an employer's disregard of reports of race discrimination can be an adverse employment action under Title VII, I would vacate the district court's grant of summary judgment on the Plaintiffs' failure to investigate claim.  Therefore, on that basis alone, I respectfully dissent.

Title VII prohibits an employer from retaliating against an employee because he has complained of race discrimination in the workplace.  42 U.S.C. § 2000e-3(a).  To establish a prima facie case of retaliation, an employee must show that: (1) he engaged in protected activity, (2) his employer took adverse action against him, and (3) there is a causal connection between the protected activity and adverse action.  Munday v. Waste Mgmt. of N. Am., 126 F.3d 239, 242 (4th Cir. 1997).

40

Title VII does not confine adverse employment actions to a particular set of acts. Indeed, "[t]he law deliberately does not take a 'laundry list' approach to retaliation, because unfortunately its forms are as varied as the human imagination will permit." Knox v. Indiana, 93 F.3d 1327, 1334-35 (7th Cir. 1996). Further, an adverse employment action need not be an ultimate employment action, but merely one that affects the terms, conditions, or privileges of employment. Gunten v. Maryland, 243 F.3d 858, 865-66 (4th Cir. 2001). "'The phrase terms, conditions, or privileges of employment evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women [and racial groups] in employment,' which includes requiring people to work in a discriminatorily hostile or abusive environment." Harris v. Forklift Sys., 510 U.S. 17, 21 (1993) (quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 64 (1986)).

An employer's failure to investigate a charge of discrimination affects the conditions of employment by communicating one message to the victim and yet another to the perpetrator of discrimination. Through his employer's inaction, a victim learns that complaining is futile, that he must endure the status quo, and that his employer will stand idly by as conditions worsen. See Bernstein v. Bd. of Educ., No. 98-3910, 1999 U.S. App. LEXIS 18702, at *12-13 (7th Cir. Aug. 6, 1999) ("Ms. Bernstein's employment conditions were adversely affected [by her employer's

41

failure to investigate] as she was forced to work in an environment where an unknown coworker or coworkers so intensely hated her that the perpetrator(s) prepared a vicious letter, complete with threats and swastikas, and mailed it to her home."). On the other hand, a perpetrator understands that he may act with impunity. In this way, his earlier acts of discrimination are ratified, and he is emboldened to engage in more abusive conduct.

Accordingly, Title VII protects employees not only from low-level supervisors who discriminate impermissibly, but also from high-level managers who condone and encourage such conduct by failing to investigate or remedy it. See, e.g., Rochon v. Gonzales, 438 F.3d 1211, 1219 (D.C. Cir. 2006) (holding that the FBI's refusal to investigate a death threat constitutes an adverse retaliatory action, because "a reasonable FBI agent well might be dissuaded from engaging in activity protected by Title VII if he knew that doing so would leave him unprotected by the FBI"); Galdamez v. Potter, 415 F.3d 1015, 1022 (9th Cir. 2005) ("An employer may be held liable for the actionable third-party harassment of its employees where it ratifies or condones the conduct by failing to investigate and remedy it after learning of it."); Knox, 93 F.3d at 1334-35 (recognizing that a jury must be allowed to "evaluate the record as a whole and to decide whether the State . . . retaliated against Knox . . . by sitting on its hands in the face of the campaign of co-worker harassment about

42

which it knew"); <u>Patton v. Sears</u>, Nos. 97-2310, 98-1621, 98-1004, 2000 U.S. App. LEXIS 27997, at *14 (6th Cir. Nov. 1, 2000) ("[T]he jury in this case could have reasonably held Sears liable for failing to follow up on Patton's complaints and condoning his co-workers' harassment."); <u>Bernstein</u>, 1999 U.S. App. LEXIS 18702, at *10-13 (holding that an employer's allegedly "intentionally ineffective and/or negligently indifferent" attempt to discover which employee sent the plaintiff a hate letter could constitute an adverse employment action); <u>Andrews v. Philadelphia</u>, 895 F.2d 1469, 1479 (3d Cir. 1990) ("[T]he jury reasonably could have determined that Doyle's failure to investigate the source of the problem implicitly encouraged squad members to continue in their abuse of Andrews."). <u>Cf.</u> <u>Munday</u>, 126 F.3d at 243 (finding no adverse employment action where "Miss Munday's employment-related complaints were addressed, investigated and, where appropriate, corrected").

In view of these precedents, I am persuaded that the district court cut its inquiry short. The record provides evidence from which a jury could conclude that the City took adverse action against the Plaintiffs after they complained of discrimination in September 2002. According to the Plaintiffs, during the two months following their complaints, the City failed to respond to their allegations. Although the African-American Battalion Chiefs told the City that Chief Fincher had withheld opportunities from them

43

because of their race, see, e.g., B.J.A. 165, the City disregarded the Plaintiffs' phone calls, see id. at 828-29, and failed to initiate an investigation, see id. at 171. Given the City's decade-long practice of ignoring accusations of race discrimination in the Fire Department, see id. at 974, 999, the Plaintiffs reasonably believed that their complaints had once again fallen on deaf ears. This belief prompted them to file charges with the EEOC. Only then, did they hear from the City. See B.J.A. 1028. Accordingly, on this record, a jury could reasonably find the City's inaction in the face of multiple race discrimination complaints sufficient to support a claim of retaliation.

Moreover, a jury could find that the City's subsequent actions undercut any suggestion that its prior inaction was in good faith. Indeed, a jury could conclude that the City's purported investigation was a sham, with a predetermined outcome. The record provides little evidence of the authenticity of the investigation. For instance, no witness records, lists of questions, or interview notes were provided. Additionally, the available evidence demonstrates that in conducting the investigation, Sanders did not delve into certain matters going to the heart of the complaints. Sanders could not recall asking Chief Fincher why he continually changed the selection criteria. See B.J.A. 190. Further, he did not ask Chief Fincher why some individuals received more notice than others of the final competition, see id. at 199, or why Chief

44

Fincher told Chief Belton that there was nothing he could have written on the exam to gain promotion during the final selection process, see id. at 215. These deficiencies perhaps explain why Chief Fincher did not recall being interviewed about the allegations. See id. at 276.

These facts, coupled with the City's indifferent response to admitted defects in the promotion process, could lead a jury to conclude that the City did not have a sincere desire to investigate and remedy alleged Title VII violations. At the close of the purported investigation, the City had reason to believe that corrective action was warranted. The City's own investigator acknowledged that Chief Fincher's periodic alteration of the selection criteria and promotion process appeared "suspicious." B.J.A. 227. In fact, when asked whether he thought race had played a role in Chief Fincher's promotion of deputy chiefs, Sanders responded, "I think it certainly looks like it." Id. at 242. Nonetheless, when Sanders was deposed several months after the investigation, his testimony revealed that the City had not taken steps to change the process for promotion. Sanders had yet to speak with Chief Fincher about how promotions to deputy chief could be "handled better," see B.J.A. 1022; he did not know whether the promotion process was going to change, id.; he did not know whether Chief Fincher had instituted a nonarbitrary system for selecting people to perform special projects, id. at 212; and could not say

45

whether Chief Fincher had been counseled about his conduct, as recommended, id. at 1034.   Thus, a jury could find the investigation a mere formality, which failed to effect any changes in the Fire Department and permitted the alleged discriminatory practices to continue.

For the reasons set forth above, I would vacate the district court's grant of summary judgment on the Plaintiffs' failure to investigate claim and remand for further proceedings.  I otherwise concur in the majority's opinion.